IN THE MATTER OF KAREN QUINLAN,
AN ALLEGED INCOMPETENT.

Argued January 26, 1976—Decided March 31, 1976.

*Mr. Paul W. Armstrong* and *Mr. James M. Crowley,* a member of the New York bar, argued the cause for appellant Joseph T. Quinlan (*Mr. Paul W. Armstrong,* attorney).

*Mr. Daniel R. Coburn* argued the cause for respondent Guardian ad Litem Thomas R. Curtin.

*Mr. William F. Hyland,* Attorney General of New Jersey, argued the cause for respondent State of New Jersey (*Mr. Hyland,* attorney; *Mr. David S. Baime* and *Mr. John De-Cicco,* Deputy Attorneys General, of counsel; *Mr. Baime, Mr. DeCicco, Ms. Jane E. Deaterly, Mr. Daniel Louis Grossman* and *Mr. Robert E. Rochford,* Deputy Attorneys General, on the brief).

*Mr. Donald G. Collester, Jr.,* Morris County Prosecutor, argued the cause for respondent County of Morris.

*Mr. Ralph Porzio* argued the cause for respondents Arshad Javed and Robert J. Morse (*Messrs. Porzio, Bromberg and Newman,* attorneys; *Mr. Porzio,* of counsel; *Mr. Porzio* and *Mr. E. Neal Zimmermann,* on the brief).

*Mr. Theodore E. B. Einhorn* argued the cause for respondent Saint Clare's Hospital.

*Mr. Edward J. Leadem* filed a brief on behalf of *amicus curiae* New Jersey Catholic Conference.

The opinion of the Court was delivered by
HUGHES, C. J.

## THE LITIGATION

The central figure in this tragic case is Karen Ann Quinlan, a New Jersey resident. At the age of 22, she lies in a debilitated and allegedly moribund state at Saint Clare's Hospital in Denville, New Jersey. The litigation has to do, in final analysis, with her life, — its continuance or cessation, — and the responsibilities, rights and duties, with regard to any fateful decision concerning it, of her family, her guardian, her doctors, the hospital, the State through its law enforcement authorities, and finally the courts of justice.

The issues are before this Court following its direct certification of the action under the rule, *R.* 2:12–1, prior to hearing in the Superior Court, Appellate Division, to which the appellant (hereafter "plaintiff") Joseph Quinlan, Karen's father, had appealed the adverse judgment of the Chancery Division.

Due to extensive physical damage fully described in the able opinion of the trial judge, Judge Muir, supporting that judgment, Karen allegedly was incompetent. Joseph Quinlan sought the adjudication of that incompetency. He wished to be appointed guardian of the person and property of his daughter. It was proposed by him that such letters of guardianship, if granted, should contain an express power to him as guardian to authorize the discontinuance of all extraordinary medical procedures now allegedly sustaining Karen's vital processes and hence her life, since these measures, he asserted, present no hope of her eventual recovery. A guardian *ad litem* was appointed by Judge Muir to represent the interest of the alleged incompetent.

By a supplemental complaint, in view of the extraordinary nature of the relief sought by plaintiff and the involvement therein of their several rights and responsibilities, other parties were added. These included the treating physicians and the hospital, the relief sought being that they be restrained from interfering with the carrying out of any such extraor-

dinary authorization in the event it were to be granted by the court. Joined, as well, was the Prosecutor of Morris County (he being charged with responsibility for enforcement of the criminal law), to enjoin him from interfering with, or projecting a criminal prosecution which otherwise might ensue in the event of, cessation of life in Karen resulting from the exercise of such extraordinary authorization were it to be granted to the guardian.

The Attorney General of New Jersey intervened as of right pursuant to *R.* 4:33–1 on behalf of the State of New Jersey, such intervention being recognized by the court in the pretrial conference order (*R.* 4:25–1 *et seq.*) of September 22, 1975. Its basis, of course, was the interest of the State in the preservation of life, which has an undoubted constitutional foundation.[1]

The matter is of transcendent importance, involving questions related to the definition and existence of death; the prolongation of life through artificial means developed by medical technology undreamed of in past generations of the practice of the healing arts;[2] the impact of such durationally

---

[1] The importance of the preservation of life is memorialized in various organic documents. The Declaration of Independence states as self-evident truths "that all men * * * are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." This ideal is inherent in the Constitution of the United States. It is explicitly recognized in our Constitution of 1947 which provides for "certain natural and unalienable rights, among which are those of enjoying and defending life * * *." *N. J. Const.* (1947), Art. I, par. 1. Our State government is established to protect such rights, *N. J. Const.* (1947), Art. I, par. 2, and, acting through the Attorney General (*N. J. S. A.* 52:17A–4(h)), it enforces them.

[2] Dr. Julius Korein, a neurologist, testified:

A. * * * [Y]ou've got a set of possible lesions that prior to the era of advanced technology and advances in medicine were no problem inasmuch as the patient would expire. They could do nothing for themselves and even external care was limited. It was — I don't know how many years ago they couldn't keep a person alive with intravenous feedings

indeterminate and artificial life prolongation on the rights of the incompetent, her family and society in general; the bearing of constitutional right and the scope of judicial responsibility, as to the appropriate response of an equity court of justice to the extraordinary prayer for relief of the plaintiff. Involved as well is the right of the plaintiff, Joseph Quinlan, to guardianship of the person of his daughter.

Among his "factual and legal contentions" under such Pretrial Order was the following:

I. Legal and Medical Death
  (a) Under the existing legal and medical definitions of death recognized by the State of New Jersey, Karen Ann Quinlan is dead.

This contention, made in the context of Karen's profound and allegedly irreversible coma and physical debility, was discarded during trial by the following stipulated amendment to the Pretrial Order:

Under any legal standard recognized by the State of New Jersey and also under standard medical practice, Karen Ann Quinlan is presently alive.

Other amendments to the Pretrial Order made at the time of trial expanded the issues before the court. The Prosecutor of Morris County sought a declaratory judgment

because they couldn't give enough calories. Now they have these high caloric tube feedings that can keep people in excellent nutrition for years so what's happened is these things have occurred all along but the technology has now reached a point where you can in fact start to replace anything outside of the brain to maintain something that is irreversibly damaged.
Q. Doctor, can the art of medicine repair the cerebral damage that was sustained by Karen?
A. In my opinion, no. * * *
Q. Doctor, in your opinion is there any course of treatment that will lead to the improvement of Karen's condition?
A. No.

as to the effect any affirmation by the court of a right in a guardian to terminate life-sustaining procedures would have with regard to enforcement of the criminal laws of New Jersey with reference to homicide. Saint Clare's Hospital, in the face of trial testimony on the subject of "brain death," sought declaratory judgment as to:

> Whether the use of the criteria developed and enunciated by the Ad Hoc Committee of the Harvard Medical School on or about August 5, 1968, as well as similar criteria, by a physician to assist in determination of the death of a patient whose cardiopulmonary functions are being artificially sustained, is in accordance with ordinary and standard medical practice.[3]

It was further stipulated during trial that Karen was indeed incompetent and guardianship was necessary, although there exists a dispute as to the determination later reached by the court that such guardianship should be bifurcated, and that Mr. Quinlan should be appointed as guardian of the trivial property but not the person of his daughter.

After certification the Attorney General filed as of right (*R.* 2:3-4) a cross-appeal[3.1] challenging the action of the trial court in admitting evidence of prior statements made by Karen while competent as to her distaste for continuance of life by extraordinary medical procedures, under circumstances not unlike those of the present case. These quoted statements were made in the context of several conversations with regard to others terminally ill and being subjected to like heroic measures. The statements were advanced as evidence of what she would want done in such a contingency as now exists. She was said to have firmly evinced her wish, in like circumstances, not to have her life prolonged by the otherwise futile use of extraordinary means. Because we

---

[3]The Harvard Ad Hoc standards, with reference to "brain death," will be discussed *infra.*

[3.1]This cross-appeal was later informally withdrawn but in view of the importance of the matter we nevertheless deal with it.

agree with the conception of the trial court that such state-
ments, since they were remote and impersonal, lacked sig-
nificant probative weight, it is not of consequence to our
opinion that we decide whether or not they were admissible
hearsay. Again, after certification, the guardian of the per-
son of the incompetent (who had been appointed as a part
of the judgment appealed from) resigned and was succeeded
by another, but that too seems irrelevant to decision. It is,
however, of interest to note the trial court's delineation (in
its supplemental opinion of November 12, 1975) of the ex-
tent of the personal guardian's authority with respect to
medical care of his ward:

> Mr. Coburn's appointment is designed to deal with those in-
> stances wherein Dr. Morse,[4] in the process of administering care
> and treatment to Karen Quinlan, feels there should be concurrence
> on the extent or nature of the care or treatment. If Mr. and
> Mrs. Quinlan are unable to give concurrence, then Mr. Coburn will
> be consulted for his concurrence.

Essentially then, appealing to the power of equity, and
relying on claimed constitutional rights of free exercise of
religion, of privacy and of protection against cruel and un-
usual punishment, Karen Quinlan's father sought judicial
authority to withdraw the life-sustaining mechanisms tempo-
rarily preserving his daughter's life, and his appointment as
guardian of her person to that end. His request was opposed
by her doctors, the hospital, the Morris County Prosecutor,
the State of New Jersey, and her guardian *ad litem*.

## THE FACTUAL BASE

An understanding of the issues in their basic perspective
suggests a brief review of the factual base developed in the

---

4Dr. Robert J. Morse, a neurologist, and Karen's treating physi-
sician from the time of her admission to Saint Clare's Hospital on
April 24, 1975 (reference was made *supra* to "treating physicians"
named as defendants; this term included Dr. Arshad Javed, a
highly qualified pulmonary internist, who considers that he manages
that phase of Karen's care with primary responsibility to the "at-
tending physician," Dr. Morse).

testimony and documented in greater detail in the opinion of the trial judge. *In re Quinlan,* 137 *N. J. Super.* 227 (Ch. Div. 1975).

On the night of April 15, 1975, for reasons still unclear, Karen Quinlan ceased breathing for at least two 15 minute periods. She received some ineffectual mouth-to-mouth resuscitation from friends. She was taken by ambulance to Newton Memorial Hospital. There she had a temperature of 100 degrees, her pupils were unreactive and she was unresponsive even to deep pain. The history at the time of her admission to that hospital was essentially incomplete and uninformative.

Three days later, Dr. Morse examined Karen at the request of the Newton admitting physician, Dr. McGee. He found her comatose with evidence of decortication, a condition relating to derangement of the cortex of the brain causing a physical posture in which the upper extremities are flexed and the lower extremities are extended. She required a respirator to assist her breathing. Dr. Morse was unable to obtain an adequate account of the circumstances and events leading up to Karen's admission to the Newton Hospital. Such initial history or etiology is crucial in neurological diagnosis. Relying as he did upon the Newton Memorial records and his own examination, he concluded that prolonged lack of oxygen in the bloodstream, anoxia, was identified with her condition as he saw it upon first observation. When she was later transferred to Saint Clare's Hospital she was still unconscious, still on a respirator and a tracheotomy had been performed. On her arrival Dr. Morse conducted extensive and detailed examinations. An electroencephalogram (EEG) measuring electrical rhythm of the brain was performed and Dr. Morse characterized the result as "abnormal but it showed some activity and was consistent with her clinical state." Other significant neurological tests, including a brain scan, an angiogram, and a lumbar puncture were normal in result. Dr. Morse testified that Karen has been in a state of coma, lack of consciousness,

since he began treating her. He explained that there are basically two types of coma, sleep-like unresponsiveness and awake unresponsiveness. Karen was originally in a sleep-like unresponsive condition but soon developed "sleep-wake" cycles, apparently a normal improvement for comatose patients occurring within three to four weeks. In the awake cycle she blinks, cries out and does things of that sort but is still totally unaware of anyone or anything around her.

Dr. Morse and other expert physicians who examined her characterized Karen as being in a "chronic persistent vegetative state." Dr. Fred Plum, one of such expert witnesses, defined this as a "subject who remains with the capacity to maintain the vegetative parts of neurological function but who * * * no longer has any cognitive function."

Dr. Morse, as well as the several other medical and neurological experts who testified in this case, believed with certainty that Karen Quinlan is not "brain dead." They identified the Ad Hoc Committee of Harvard Medical School report (*infra*) as the ordinary medical standard for determining brain death, and all of them were satisfied that Karen met none of the criteria specified in that report and was therefore not "brain dead" within its contemplation.

In this respect it was indicated by Dr. Plum that the brain works in essentially two ways, the vegetative and the sapient. He testified:

We have an internal vegetative regulation which controls body temperature which controls breathing, which controls to a considerable degree blood pressure, which controls to some degree heart rate, which controls chewing, swallowing and which controls sleeping and waking. We have a more highly developed brain which is uniquely human which controls our relation to the outside world, our capacity to talk, to see, to feel, to sing, to think. Brain death necessarily must mean the death of both of these functions of the brain, vegetative and the sapient. Therefore, the presence of any function which is regulated or governed or controlled by the deeper parts of the brain which in laymen's terms might be considered purely vegetative would mean that the brain is not biologically dead.

Because Karen's neurological condition affects her respiratory ability (the respiratory system being a brain stem function) she requires a respirator to assist her breathing. From the time of her admission to Saint Clare's Hospital Karen has been assisted by an MA–1 respirator, a sophisticated machine which delivers a given volume of air at a certain rate and periodically provides a "sigh" volume, a relatively large measured volume of air designed to purge the lungs of excretions. Attempts to "wean" her from the respirator were unsuccessful and have been abandoned.

The experts believe that Karen cannot now survive without the assistance of the respirator; that exactly how long she would live without it is unknown; that the strong likelihood is that death would follow soon after its removal, and that removal would also risk further brain damage and would curtail the assistance the respirator presently provides in warding off infection.

It seemed to be the consensus not only of the treating physicians but also of the several qualified experts who testified in the case, that removal from the respirator would not conform to medical practices, standards and traditions.

The further medical consensus was that Karen in addition to being comatose is in a chronic and persistent "vegetative" state, having no awareness of anything or anyone around her and existing at a primitive reflex level. Although she does have some brain stem function (ineffective for respiration) and has other reactions one normally associates with being alive, such as moving, reacting to light, sound and noxious stimuli, blinking her eyes, and the like, the quality of her feeling impulses is unknown. She grimaces, makes sterotyped cries and sounds and has chewing motions. Her blood pressure is normal.

Karen remains in the intensive care unit at Saint Clare's Hospital, receiving 24-hour care by a team of four nurses characterized, as was the medical attention, as "excellent." She is nourished by feeding by way of a nasal-gastro tube and is routinely examined for infection, which under these

circumstances is a serious life threat. The result is that her condition is considered remarkable under the unhappy circumstances involved.

Karen is described as emaciated, having suffered a weight loss of at least 40 pounds, and undergoing a continuing deteriorative process. Her posture is described as fetal-like and grotesque; there is extreme flexion-rigidity of the arms, legs and related muscles and her joints are severely rigid and deformed.

From all of this evidence, and including the whole testimonial record, several basic findings in the physical area are mandated. Severe brain and associated damage, albeit of uncertain etiology, has left Karen in a chronic and persistent vegetative state. No form of treatment which can cure or improve that condition is known or available. As nearly as may be determined, considering the guarded area of remote uncertainties characteristic of most medical science predictions, she can *never* be restored to cognitive or sapient life. Even with regard to the vegetative level and improvement therein (if such it may be called) the prognosis is extremely poor and the extent unknown if it should in fact occur.

She is debilitated and moribund and although fairly stable at the time of argument before us (no new information having been filed in the meanwhile in expansion of the record), no physician risked the opinion that she could live more than a year and indeed she may die much earlier. Excellent medical and nursing care so far has been able to ward off the constant threat of infection, to which she is peculiarly susceptible because of the respirator, the tracheal tube and other incidents of care in her vulnerable condition. Her life accordingly is sustained by the respirator and tubal feeding, and removal from the respirator would cause her death soon, although the time cannot be stated with more precision.

The determination of the fact and time of death in past years of medical science was keyed to the action of the heart and blood circulation, in turn dependent upon pulmonary

activity, and hence cessation of these functions spelled out the reality of death.[5]

Developments in medical technology have obfuscated the use of the traditional definition of death. Efforts have been made to define irreversible coma as a new criterion for death, such as by the 1968 report of the Ad Hoc Committee of the Harvard Medical School (the Committee comprising ten physicians, an historian, a lawyer and a theologian), which asserted that:

From ancient times down to the recent past it was clear that, when the respiration and heart stopped, the brain would die in a few minutes; so the obvious criterion of no heart beat as synonymous with death was sufficiently accurate. In those times the heart was considered to be the central organ of the body; it is not surprising that its failure marked the onset of death. This is no longer valid when modern resuscitative and supportive measures are used. These improved activities can now restore "life" as judged by the ancient standards of persistent respiration and continuing heart beat. This can be the case even when there is not the remotest possibility of an individual recovering consciousness following massive brain damage. ["A Definition of Irreversible Coma," 205 J. A. M. A. 337, 339 (1968)].

The Ad Hoc standards, carefully delineated, included absence of response to pain or other stimuli, pupilary reflexes, corneal, pharyngeal and other reflexes, blood pressure, spontaneous respiration, as well as "flat" or isoelectric electroencephalograms and the like, with all tests repeated "at least 24 hours later with no change." In such circumstances, where all of such criteria have been met as showing "brain death," the Committee recommends with regard to the respirator:

---

[5]Death. The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc. *Black's Law Dictionary* 488 (rev. 4th ed. 1968).

The patient's condition can be determined only by a physician. When the patient is hopelessly damaged as defined above, the family and all colleagues who have participated in major decisions concerning the patient, and all nurses involved, should be so informed. Death is to be declared and *then* the respirator turned off. The decision to do this and the responsibility for it are to be taken by the physician-in-charge, in consultation with one or more physicians who have been directly involved in the case. It is unsound and undesirable to force the family to make the decision. [205 *J. A. M. A., supra* at 338 (emphasis in original)].

But, as indicated, it was the consensus of medical testimony in the instant case that Karen, for all her disability, met none of these criteria, nor indeed any comparable criteria extant in the medical world and representing, as does the Ad Hoc Committee report, according to the testimony in this case, prevailing and accepted medical standards.

We have adverted to the "brain death" concept and Karen's disassociation with any of its criteria, to emphasize the basis of the medical decision made by Dr. Morse. When plaintiff and his family, finally reconciled to the certainty of Karen's impending death, requested the withdrawal of life support mechanisms, he demurred. His refusal was based upon his conception of medical standards, practice and ethics described in the medical testimony, such as in the evidence given by another neurologist, Dr. Sidney Diamond, a witness for the State. Dr. Diamond asserted that no physician would have failed to provide respirator support at the outset, and none would interrupt its life-saving course thereafter, except in the case of cerebral death. In the latter case, he thought the respirator would in effect be disconnected from one already dead, entitling the physician under medical standards and, he thought, legal concepts, to terminate the supportive measures. We note Dr. Diamond's distinction of major surgical or transfusion procedures in a terminal case not involving cerebral death, such as here:

The subject has lost human qualities. It would be incredible, and I think unlikely, that any physician would respond to a sudden hemorrhage, massive hemorrhage or a loss of all her defensive blood

cells, by giving her large quantities of blood. I think that * * * major surgical procedures would be out of the question even if they were known to be essential for continued physical existence.

This distinction is adverted to also in the testimony of Dr. Julius Korein, a neurologist called by plaintiff. Dr. Korein described a medical practice concept of "judicious neglect" under which the physician will say:

Don't treat this patient anymore, * * * it does not serve either the patient, the family, or society in any meaningful way to continue treatment with this patient.

Dr. Korein also told of the unwritten and unspoken standard of medical practice implied in the foreboding initials DNR (do not resuscitate), as applied to the extraordinary terminal case:

Cancer, metastatic cancer, involving the lungs, the liver, the brain, multiple involvements, the physician may or may not write: Do not resuscitate. * * * [I]t could be said to the nurse: if this man stops breathing don't resuscitate him. * * * No physician that I know personally is going to try and resuscitate a man riddled with cancer and in agony and he stops breathing. They are not going to put him on a respirator. * * * I think that would be the height of misuse of technology.

While the thread of logic in such distinctions may be elusive to the non-medical lay mind, in relation to the supposed imperative to sustain life at all costs, they nevertheless relate to medical decisions, such as the decision of Dr. Morse in the present case. We agree with the trial court that that decision was in accord with Dr. Morse's conception of medical standards and practice.

We turn to that branch of the factual case pertaining to the application for guardianship, as distinguished from the nature of the authorization sought by the applicant. The character and general suitability of Joseph Quinlan as guardian for his daughter, in ordinary circumstances, could not be doubted. The record bespeaks the high degree of

familial love which pervaded the home of Joseph Quinlan and reached out fully to embrace Karen, although she was living elsewhere at the time of her collapse. The proofs showed him to be deeply religious, imbued with a morality so sensitive that months of tortured indecision preceded his belated conclusion (despite earlier moral judgments reached by the other family members, but unexpressed to him· in order not to influence him) to seek the termination of life-supportive measures sustaining Karen. A communicant of the Roman Catholic Church, as were other family members, he first sought solace in private prayer looking with confidence, as he says, to the Creator, first for the recovery of Karen and then, if that were not possible, for guidance with respect to the awesome decision confronting him.

To confirm the moral rightness of the decision he was about to make he consulted with his parish priest and later with the Catholic chaplain of Saint Clare's Hospital. He would not, he testified, have sought termination if that act were to be morally wrong or in conflict with the tenets of the religion he so profoundly respects. He was disabused of doubt, however, when the position of the Roman Catholic Church was made known to him as it is reflected in the record in this case. While it is not usual for matters of religious dogma or concepts to enter a civil litigation (except as they may bear upon constitutional right, or sometimes, familial matters; cf. *In re Adoption of E, 59 N. J.* 36 (1971)), they were rightly admitted in evidence here. The judge was bound to measure the character and motivations in all respects of Joseph Quinlan as prospective guardian; and insofar as these religious matters bore upon them, they were properly scrutinized and considered by the court.

Thus germane, we note the position of that Church as illuminated by the record before us. We have no reason to believe that it would be at all discordant with the whole of Judeo-Christian tradition, considering its central respect and reverence for the sanctity of human life. It was in this sense of relevance that we admitted as *amicus curiae* the New Jer-

sey Catholic Conference, essentially the spokesman for the various Catholic bishops of New Jersey, organized to give witness to spiritual values in public affairs in the statewide community. The position statement of Bishop Lawrence B. Casey, reproduced in the *amicus* brief, projects these views:

(a) The verification of the fact of death in a particular case cannot be deduced from any religious or moral principle and, under this aspect, does not fall within the competence of the church; — that dependence must be had upon traditional and medical standards, and by these standards Karen Ann Quinlan is assumed to be alive.

(b) The request of plaintiff for authority to terminate a medical procedure characterized as "an extraordinary means of treatment" would not involve euthanasia. This upon the reasoning expressed by Pope Pius XII in his "allocutio" (address) to anesthesiologists on November 24, 1957, when he dealt with the question:

Does the anesthesiologist have the right, or is he bound, in all cases of deep unconsciousness, even in those that are completely hopeless in the opinion of the competent doctor, to use modern artificial respiration apparatus, even against the will of the family?

His answer made the following points:

1. In ordinary cases the doctor has the right to act in this manner, but is not bound to do so unless this is the only way of fulfilling another certain moral duty.
2. The doctor, however, has no right independent of the patient. He can act only if the patient explicitly or implicitly, directly or indirectly gives him the permission.
3. The treatment as described in the question constitutes extraordinary means of preserving life and so there is no obligation to use them nor to give the doctor permission to use them.
4. The rights and the duties of the family depend on the presumed will of the unconscious patient if he or she is of legal age, and the family, too, is bound to use only ordinary means.
5. This case is not to be considered euthanasia in any way; that would never be licit. The interruption of attempts at resuscitation, even when it causes the arrest of circulation, is not more than an indirect cause of the cessation of life, and we must apply in this case the principle of double effect.

So it was that the Bishop Casey statement validated the decision of Joseph Quinlan:

Competent medical testimony has established that Karen Ann Quinlan has no reasonable hope of recovery from her comatose state by the use of any available medical procedures. The continuance of mechanical (cardiorespiratory) supportive measures to sustain continuation of her body functions and her life constitute extraordinary means of treatment. *Therefore, the decision of Joseph* * * * *Quinlan to request the discontinuance of this treatment is, according to the teachings of the Catholic Church, a morally correct decision.* (emphasis in original)

And the mind and purpose of the intending guardian were undoubtedly influenced by factors included in the following reference to the interrelationship of the three disciplines of theology, law and medicine as exposed in the Casey statement:

The right to a natural death is one outstanding area in which the disciplines of theology, medicine and law overlap; or, to put it another way, it is an area in which these three disciplines convene.

Medicine with its combination of advanced technology and professional ethics is both able and inclined to prolong biological life. Law with its felt obligation to protect the life and freedom of the individual seeks to assure each person's right to live out his human life until its natural and inevitable conclusion. Theology with its acknowledgment of man's dissatisfaction with biological life as the ultimate source of joy * * * defends the sacredness of human life and defends it from all direct attacks.

These disciplines do not conflict with one another, but are necessarily conjoined in the application of their principles in a particular instance such as that of Karen Ann Quinlan. Each must in some way acknowledge the other without denying its own competence. The civil law is not expected to assert a belief in eternal life; nor, on the other hand, is it expected to ignore the right of the individual to profess it, and to form and pursue his conscience in accord with that belief. Medical science is not authorized to directly cause natural death; nor, however, is it expected to prevent it when it is inevitable and all hope of a return to an even partial exercise of human life is irreparably lost. Religion is not expected to define biological death; nor, on its part, is it expected to relinquish its responsibility to assist man in the formation and pursuit of a correct conscience as to the acceptance of natural death

when science has confirmed its inevitability beyond any hope other than that of preserving biological life in a merely vegetative state.

And the gap in the law is aptly described in the Bishop Casey statement:

In the present public discussion of the case of Karen Ann Quinlan it has been brought out that responsible people involved in medical care, patients and families have exercised the freedom to terminate or withhold certain treatments as extraordinary means in cases judged to be terminal, i. e., cases which hold no realistic hope for some recovery, in accord with the expressed or implied intentions of the patients themselves. To whatever extent this has been happening it has been without sanction in civil law. Those involved in such actions, however, have ethical and theological literature to guide them in their judgments and actions. Furthermore, such actions have not in themselves undermined society's reverence for the lives of sick and dying people.

It is both possible and necessary for society to have laws and ethical standards which provide freedom for decisions, in accord with the expressed or implied intentions of the patient, to terminate or withhold extraordinary treatment in cases which are judged to be hopeless by competent medical authorities, without at the same time leaving an opening for euthanasia. Indeed, to accomplish this, it may simply be required that courts and legislative bodies recognize the present standards and practices of many people engaged in medical care who have been doing what the parents of Karen Ann Quinlan are requesting authorization to have done for their beloved daughter.

Before turning to the legal and constitutional issues involved, we feel it essential to reiterate that the "Catholic view" of religious neutrality in the circumstances of this case is considered by the Court only in the aspect of its impact upon the conscience, motivation and purpose of the intending guardian, Joseph Quinlan, and not as a precedent in terms of the civil law.

If Joseph Quinlan, for instance, were a follower and strongly influenced by the teachings of Buddha, or if, as an agnostic or atheist, his moral judgments were formed without reference to religious feelings, but were nevertheless formed and viable, we would with equal attention and high respect consider these elements, as bearing upon his charac-

ter, motivations and purposes as relevant to his qualification and suitability as guardian.

It is from this factual base that the Court confronts and responds to three basic issues:

1. Was the trial court correct in denying the specific relief requested by plaintiff, *i. e.*, authorization for termination of the life-supporting apparatus, on the case presented to him? Our determination on that question is in the affirmative.

2. Was the court correct in withholding letters of guardianship from the plaintiff and appointing in his stead a stranger? On that issue our determination is in the negative.

3. Should this Court, in the light of the foregoing conclusions, grant declaratory relief to the plaintiff? On that question our Court's determination is in the affirmative.

This brings us to a consideration of the constitutional and legal issues underlying the foregoing determinations.

## CONSTITUTIONAL AND LEGAL ISSUES

At the outset we note the dual role in which plaintiff comes before the Court. He not only raises, derivatively, what he perceives to be the constitutional and legal rights of his daughter Karen, but he also claims certain rights independently as parent.

■■ Although generally a litigant may assert only his own constitutional rights, we have no doubt that plaintiff has sufficient standing to advance both positions.

■ ■ While no express constitutional language limits judicial activity to cases and controversies, New Jersey courts will not render advisory opinions or entertain proceedings by plaintiffs who do not have sufficient legal standing to maintain their actions. *Walker v. Stanhope,* 23 *N. J.* 657, 660 (1957). However, as in this case, New Jersey courts commonly grant declaratory relief. Declaratory Judgments Act, *N. J. S. A.* 2A:16–50 *et seq.* And our courts

hold that where the plaintiff is not simply an interloper and the proceeding serves the public interest, standing will be found. *Walker v. Stanhope, supra,* 23 *N. J.* at 661–66; *Koons v. Atlantic City Bd. of Comm'rs,* 134 *N. J. L.* 329, 338–39 (Sup. Ct. 1946), *aff'd,* 135 *N. J. L.* 204 (E. & A. 1947). In *Crescent Park Tenants Ass'n v. Realty Equities Corp.,* 58 *N. J.* 98 (1971), Justice Jacobs said:

* * * [W]e have appropriately confined litigation to those situations where the litigants concerned with the subject matter evidenced a sufficient stake and real adverseness. In the overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of "just and expeditious determinations on the ultimate merits." [58 *N. J.* at 107–08 (quoting from *Tumarkin v. Friedman,* 17 *N. J. Super.* 20, 21 (App. Div. 1951), certif. den., 9 *N. J.* 287 (1952))].

The father of Karen Quinlan is certainly no stranger to the present controversy. His interests are real and adverse and he raises questions of surpassing importance. Manifestly, he has standing to assert his daughter's constitutional rights, she being incompetent to do so.

I. *The Free Exercise of Religion*

We think the contention as to interference with religious beliefs or rights may be considered and dealt with without extended discussion, given the acceptance of distinctions so clear and simple in their precedential definition as to be dispositive on their face.

Simply stated, the right to religious beliefs is absolute but conduct in pursuance thereof is not wholly immune from governmental restraint. *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N. J.* 576, 580–81 (1971). So it is that, for the sake of life, courts sometimes (but not always) order blood transfusions for Jehovah's Witnesses (whose religious beliefs abhor such procedure), *Application of President & Directors of Georgetown College, Inc.,* 118 *U. S. App. D. C.* 80, 331 *F.* 2d 1000 (D. C. Cir.), *cert. den.,* 377 *U. S.* 978,

84 *S. Ct.* 1883, 12 *L. Ed.* 2d 746 (1964); *United States v. George,* 239 *F. Supp.* 752 (D. Conn. 1965); *John F. Kennedy Memorial Hosp. v. Heston, supra; Powell v. Columbian Presbyterian Medical Center,* 49 *Misc.* 2d 215, 267 *N. Y. S.* 2d 450 (Sup. Ct. 1965); *but see In re Osborne,* 294 *A.* 2d 372 (D. C. Ct. App. 1972); *In re Estate of Brooks,* 32 *Ill.* 2d 361, 205 *N. E.* 2d 435 (Sup. Ct. 1965); *Erickson v. Dilgard,* 44 *Misc.* 2d 27, 252 *N. Y. S.* 2d 705 (Sup. Ct. 1962); *see generally* Annot., "Power Of Courts Or Other Public Agencies, In The Absence of Statutory Authority, To Order Compulsory Medical Care for Adult," 9 *A. L. R.* 3d 1391 (1966); forbid exposure to death from handling virulent snakes or ingesting poison (interfering with deeply held religious sentiments in such regard), *e. g., Hill v. State,* 38 *Ala. App.* 404, 88 *So.* 2d 880 (Ct. App.), *cert.* den., 264 *Ala.* 697, 88 *So.* 2d 887 (Sup. Ct. 1956); *State v. Massey,* 229 *N. C.* 734, 51 *S. E.* 2d 179 (Sup. Ct.), appeal dismissed *sub nom., Bunn v. North Carolina,* 336 *U. S.* 942, 69 *S. Ct.* 813, 93 *L. Ed.* 1099 (1949); *State ex rel. Swann v. Pack,* —— *Tenn.* ——, 527 *S. W.* 2d 99 (Sup. Ct. 1975), *cert.* den., —— *U. S.* ——, 96 *S. Ct* .1429, 47 *L. Ed.* 2d 360 (1976); and protect the public health as in the case of compulsory vaccination (over the strongest of religious objections), *e. g., Wright v. DeWitt School Dist. 1,* 238 *Ark.* 906, 385 *S. W.* 2d 644 (Sup. Ct. 1965); *Mountain Lakes Bd. of Educ. v. Maas,* 56 *N. J. Super.* 245 (App. Div. 1959), *aff'd* o.b., 31 *N. J.* 537 (1960), *cert.* den., 363 *U. S.* 843, 80 *S. Ct.* 1613, 4 *L. Ed.* 2d 1727 (1960); *McCartney v. Austin,* 57 *Misc.* 2d 525, 293 *N. Y. S.* 2d 188 (Sup. Ct. 1968). The public interest is thus considered paramount, without essential dissolution of respect for religious beliefs.

██ We think, without further examples, that, ranged against the State's interest in the preservation of life, the impingement of religious belief, much less religious "neutrality" as here, does not reflect a constitutional question, in the circumstances at least of the case presently before the Court.

Moreover, like the trial court, we do not recognize an independent parental right of religious freedom to support the relief requested. 137 *N. J. Super.* at 267–68.

## II. *Cruel and Unusual Punishment*

█ Similarly inapplicable to the case before us is the Constitution's Eighth Amendment protection against cruel and unusual punishment which, as held by the trial court, is not relevant to situations other than the imposition of penal sanctions. Historic in nature, it stemmed from punitive excesses in the infliction of criminal penalties.[6] We

---

[6]It is generally agreed that the Eighth Amendment's provision of "[n]or cruel and unusual punishments inflicted" is drawn verbatim from the English Declaration of Rights. *See* 1 Wm. & M., sess. 2, c. 2 (1689). The prohibition arose in the context of excessive punishments for crimes, punishments that were barbarous and savage as well as disproportionate to the offense committed. *See generally* Granucci, " 'Nor Cruel and Unusual Punishments Inflicted:' The Original Meaning," 57 *Calif. L. Rev.* 839, 844–60 (1969) ; Note, "The Cruel and Unusual Punishment Clause and the Substantive Criminal Law," 79 *Harv. L. Rev.* 635, 636–39 (1966). The principle against excessiveness in criminal punishments can be traced back to Chapters 20-22 of the *Magna Carta* (1215). The historical background of the Eighth Amendment was examined at some length in various opinions in *Furman v. Georgia,* 408 *U. S.* 238, 92 *S. Ct.* 2726, 33 *L. Ed.* 2d 346 (1972).

The Constitution itself is silent as to the meaning of the word "punishment." Whether it refers to the variety of legal and nonlegal penalties that human beings endure or whether it must be in connection with a criminal rather than a civil proceeding is not stated in the document. But the origins of the clause are clear. And the cases construing it have consistently held that the "punishment" contemplated by the Eighth Amendment is the penalty inflicted by a court for the commission of a crime or in the enforcement of what is a criminal law. *See, e. g., Trop v. Dulles,* 356 *U. S.* 86, 94–99, 78 *S. Ct.* 590, 594–97, 2 *L. Ed.* 2d 630, 638–41 (1957). *See generally* Note, "The Effectiveness of the Eighth Amendment: An Appraisal of Cruel and Unusual Punishment," 36 *N. Y. U. L. Rev.* 846, 854–57 (1961). A deprivation, forfeiture or penalty arising out of a civil proceeding or otherwise cannot be "cruel and unusual punishment" within the meaning of the constitutional clause.

find no precedent in law which would justify its extension to the correction of social injustice or hardship, such as, for instance, in the case of poverty. The latter often condemns the poor and deprived to horrendous living conditions which could certainly be described in the abstract as "cruel and unusual punishment." Yet the constitutional base of protection from "cruel and unusual punishment" is plainly irrelevant to such societal ills which must be remedied, if at all, under other concepts of constitutional and civil right.

██ So it is in the case of the unfortunate Karen Quinlan. Neither the State, nor the law, but the accident of fate and nature, has inflicted upon her conditions which though in essence cruel and most unusual, yet do not amount to "punishment" in any constitutional sense.

Neither the judgment of the court below, nor the medical decision which confronted it, nor the law and equity perceptions which impelled its action, nor the whole factual base upon which it was predicated, inflicted "cruel and unusual punishment" in the constitutional sense.

## III. *The Right of Privacy*[7]

It is the issue of the constitutional right of privacy that has given us most concern, in the exceptional circumstances of this case. Here a loving parent, *qua* parent and raising the rights of his incompetent and profoundly damaged daughter, probably irreversibly doomed to no more than a biologically vegetative remnant of life, is before the court. He seeks authorization to abandon specialized technological procedures which can only maintain for a time a body hav-

---

[7]The right we here discuss is included within the class of what have been called rights of "personality." *See* Pound, "Equitable Relief against Defamation and Injuries to Personality," 29 *Harv. L. Rev.* 640, 668–76 (1916). Equitable jurisdiction with respect to the recognition and enforcement of such rights has long been recognized in New Jersey. *See, e. g., Vanderbilt v. Mitchell,* 72 *N. J. Eq.* 910, 919–20 (E. & A. 1907).

ing no potential for resumption or continuance of other than a "vegetative" existence.

We have no doubt, in these unhappy circumstances, that if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death. To this extent we may distinguish *Heston, supra,* which concerned a severely injured young woman (Delores Heston), whose life depended on surgery and blood transfusion; and who was in such extreme shock that she was unable to express an informed choice (although the Court apparently considered the case as if the patient's own religious decision to resist transfusion were at stake), but most importantly a patient apparently salvable to long life and vibrant health; — a situation not at all like the present case.

We have no hesitancy in deciding, in the instant diametrically opposite case, that no external compelling interest of the State could compel Karen to endure the unendurable, only to vegetate a few measurable months with no realistic possibility of returning to any semblance of cognitive or sapient life. We perceive no thread of logic distinguishing between such a choice on Karen's part and a similar choice which, under the evidence in this case, could be made by a competent patient terminally ill, riddled by cancer and suffering great pain; such a patient would not be resuscitated or put on a respirator in the example described by Dr. Korein, and *a fortiori* would not be kept *against his will* on a respirator.

Although the Constitution does not explicitly mention a right of privacy, Supreme Court decisions have recognized that a right of personal privacy exists and that certain areas of privacy are guaranteed under the Constitution. *Eisenstadt v. Baird,* 405 *U. S.* 438, 92 *S. Ct.* 1029, 31 *L. Ed.* 2d 349 (1972); *Stanley v. Georgia,* 394 *U. S.* 557, 89 *S. Ct.* 1243,

22 *L. Ed.* 2d 542 (1969). The Court has interdicted judicial intrusion into many aspects of personal decision, sometimes basing this restraint upon the conception of a limitation of judicial interest and responsibility, such as with regard to contraception and its relationship to family life and decision. *Griswold v. Connecticut*, 381 *U. S.* 479, 85 *S. Ct.* 1678, 14 *L. Ed.* 2d 510 (1965).

The Court in *Griswold* found the unwritten constitutional right of privacy to exist in the penumbra of specific guarantees of the Bill of Rights "formed by emanations from those guarantees that help give them life and substance." 381 *U. S.* at 484, 85 *S. Ct.* at 1681, 14 *L. Ed.* 2d at 514. Presumably this right is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances, in much the same way as it is broad enough to encompass a woman's decision to terminate pregnancy under certain conditions. *Roe v. Wade*, 410 *U. S.* 113, 153, 93 *S. Ct.* 705, 727, 35 *L. Ed.* 2d 147, 177 (1973).

Nor is such right of privacy forgotten in the New Jersey Constitution. *N. J. Const.* (1947), Art. I, par. 1.

The claimed interests of the State in this case are essentially the preservation and sanctity of human life and defense of the right of the physician to administer medical treatment according to his best judgment. In this case the doctors say that removing Karen from the respirator will conflict with their professional judgment. The plaintiff answers that Karen's present treatment serves only a maintenance function; that the respirator cannot cure or improve her condition but at best can only prolong her inevitable slow deterioration and death; and that the interests of the patient, as seen by her surrogate, the guardian, must be evaluated by the court as predominant, even in the face of an opinion *contra* by the present attending physicians. Plaintiff's distinction is significant. The nature of Karen's care and the realistic chances of her recovery are quite unlike

those of the patients discussed in many of the cases where treatments were ordered. In many of those cases the medical procedure required (usually a transfusion) constituted a minimal bodily invasion and the chances of recovery and return to functioning life were very good. We think that the State's interest *contra* weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest. It is for that reason that we believe Karen's choice, if she were competent to make it, would be vindicated by the law. Her prognosis is extremely poor, — she will never resume cognitive life. And the bodily invasion is very great, — she requires 24 hour intensive nursing care, antibiotics, the assistance of a respirator, a catheter and feeding tube.

Our affirmation of Karen's independent right of choice, however, would ordinarily be based upon her competency to assert it. The sad truth, however, is that she is grossly incompetent and we cannot discern her supposed choice based on the testimony of her previous conversations with friends, where such testimony is without sufficient probative weight. 137 *N. J. Super.* at 260. Nevertheless we have concluded that Karen's right of privacy may be asserted on her behalf by her guardian under the peculiar circumstances here present.

If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice. The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment, subject to the qualifications hereinafter stated, as to whether she would exercise it in these circumstances. If their conclusion is in the affirmative this decision should be accepted by a society the overwhelming

majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them. It is for this reason that we determine that Karen's right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record.

Regarding Mr. Quinlan's right of privacy, we agree with Judge Muir's conclusion that there is no parental constitutional right that would entitle him to a grant of relief *in propria persona. Id.* at 266. Insofar as a parental right of privacy has been recognized, it has been in the context of determining the rearing of infants and, as Judge Muir put it, involved "continuing life styles." *See Wisconsin v. Yoder,* 406 *U. S.* 205, 92 *S. Ct.* 1526, 32 *L. Ed.* 2d 15 (1972); *Pierce v. Society of Sisters,* 268 *U. S.* 510, 45 *S. Ct.* 571, 69 *L. Ed.* 1070 (1925); *Meyer v. Nebraska,* 262 *U. S.* 390, 43 *S. Ct.* 625, 67 *L. Ed.* 1042 (1923). Karen Quinlan is a 22 year old adult. Her right of privacy in respect of the matter before the Court is to be vindicated by Mr. Quinlan as guardian, as hereinabove determined.

## IV. *The Medical Factor*

Having declared the substantive legal basis upon which plaintiff's rights as representative of Karen must be deemed predicated, we face and respond to the assertion on behalf of defendants that our premise unwarrantably offends prevailing medical standards. We thus turn to consideration of the medical decision supporting the determination made below, conscious of the paucity of pre-existing legislative and judicial guidance as to the rights and liabilities therein involved.

A significant problem in any discussion of sensitive medical-legal issues is the marked, perhaps unconscious, tendency of many to distort what the law is, in pursuit of an exposition of what they would like the law to be. Nowhere is this barrier to the intelligent resolution of legal controversies more obstructive than in the debate over

patient rights at the end of life. Judicial refusals to order lifesaving treatment in the face of contrary claims of bodily self-determination or free religious exercise are too often cited in support of a preconceived "right to die," even though the patients, wanting to live, have claimed no such right. Conversely, the assertion of a religious or other objection to lifesaving treatment is at times condemned as attempted suicide, even though suicide means something quite diferent in the law. [Byrn, "Compulsory Lifesaving Treatment For The Competent Adult," 44 *Fordham L. Rev.* 1 (1975)].

Perhaps the confusion there adverted to stems from mention by some courts of statutory or common law condemnation of suicide as demonstrating the state's interest in the preservation of life. We would see, however, a real distinction between the self-infliction of deadly harm and a self-determination against artificial life support or radical surgery, for instance, in the face of irreversible, painful and certain imminent death. The contrasting situations mentioned are analogous to those continually faced by the medical profession. When does the institution of life-sustaining procedures, ordinarily mandatory, become the subject of medical discretion in the context of administration to persons *in extremis*? And when does the withdrawal of such procedures, from such persons already supported by them, come within the orbit of medical discretion? When does a determination as to either of the foregoing contingencies court the hazard of civil or criminal liability on the part of the physician or institution involved?

The existence and nature of the medical dilemma need hardly be discussed at length, portrayed as it is in the present case and complicated as it has recently come to be in view of the dramatic advance of medical technology. The dilemma is there, it is real, it is constantly resolved in accepted medical practice without attention in the courts, it pervades the issues in the very case we here examine. The branch of the dilemma involving the doctor's responsibility and the relationship of the court's duty was thus conceived by Judge Muir:

Doctors * * * to treat a patient, must deal with medical tradition and past case histories. They must be guided by what they do know. The extent of their training, their experience, consultation with other physicians, must guide their decision-making processes in providing care to their patient. The nature, extent and duration of care by societal standards is the responsibility of a physician. The morality and conscience of our society places this responsibility in the hands of the physician. What justification is there to remove it from the control of the medical profession and place it in the hands of the courts? [137 *N. J. Super.* at 259].

Such notions as to the distribution of responsibility, heretofore generally entertained, should however neither impede this Court in deciding matters clearly justiciable nor preclude a re-examination by the Court as to underlying human values and rights. Determinations as to these must, in the ultimate, be responsive not only to the concepts of medicine but also to the common moral judgment of the community at large. In the latter respect the Court has a non-delegable judicial responsibility.

Put in another way, the law, equity and justice must not themselves quail and be helpless in the face of modern technological marvels presenting questions hitherto unthought of. Where a Karen Quinlan, or a parent, or a doctor, or a hospital, or a State seeks the process and response of a court, it must answer with its most informed conception of justice in the previously unexplored circumstances presented to it. That is its obligation and we are here fulfilling it, for the actors and those having an interest in the matter should not go without remedy.

Courts in the exercise of their *parens patriae* responsibility to protect those under disability have sometimes implemented medical decisions and authorized their carrying out under the doctrine of "substituted judgment." *Hart v. Brown,* 29 *Conn. Sup.* 368, 289 *A.* 2d 386, 387–88 (Super. Ct. 1972) ; *Strunk v. Strunk,* 445 *S. W.* 2d 145, 147–48 (Ky. Ct. App. 1969). For as Judge Muir pointed out:

"As part of the inherent power of equity, a Court of Equity has full and complete jurisdiction over the persons of those who labor

under any legal disability. * * * The Court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the Court may pass upon purely personal rights." [137 *N. J. Super.* at 254 (quoting from *Am. Jur.* 2d, Equity § 69 (1966))].

But insofar as a court, having no inherent medical expertise, is called upon to overrule a professional decision made according to prevailing medical practice and standards, a different question is presented. As mentioned below, a doctor is required

"to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field." *Schueler v. Strelinger*, 43 *N. J.* 330, 344 (1964). If he is a specialist he "must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge". *Clark v. Wichman*, 72 *N. J. Super.* 486, 493 (App. Div. 1962). This is the duty that establishes his legal obligations to his patients. [137 *N. J. Super.* at 257–58].

The medical obligation is related to standards and practice prevailing in the profession. The physicians in charge of the case, as noted above, declined to withdraw the respirator. That decision was consistent with the proofs below as to the then existing medical standards and practices.

Under the law as it then stood, Judge Muir was correct in declining to authorize withdrawal of the respirator.

However, in relation to the matter of the declaratory relief sought by plaintiff as representative of Karen's interests, we are required to reevaluate the applicability of the medical standards projected in the court below. The question is whether there is such internal consistency and rationality in the application of such standards as should warrant their constituting an ineluctable bar to the effectua-

tion of substantive relief for plaintiff at the hands of the court. We have concluded not.

In regard to the foregoing it is pertinent that we consider the impact on the standards both of the civil and criminal law as to medical liability and the new technological means of sustaining life irreversibly damaged.

The modern proliferation of substantial malpractice litigation and the less frequent but even more unnerving possibility of criminal sanctions would seem, for it is beyond human nature to suppose otherwise, to have bearing on the practice and standards as they exist. The brooding presence of such possible liability, it was testified here, had no part in the decision of the treating physicians. As did Judge Muir, we afford this testimony full credence. But we cannot believe that the stated factor has not had a strong influence on the standards, as the literature on the subject plainly reveals. (See footnote 8, *infra*). Moreover our attention is drawn not so much to the recognition by Drs. Morse and Javed of the extant practice and standards but to the widening ambiguity of those standards themselves in their application to the medical problems we are discussing.

The agitation of the medical community in the face of modern life prolongation technology and its search for definitive policy are demonstrated in the large volume of relevant professional commentary.[8]

---

[8] *See, e. g., Downing, Euthanasia and the Right to Death* (1969) ; *St. John-Stevas, Life, Death and the Law* (1961) ; *Williams, The Sanctity of Human Life and the Criminal Law* (1957) ; Appel, "Ethical and Legal Questions Posed by Recent Advances in Medicine," 205 *J. A. M. A.* 513 (1968) ; Cantor, "A Patient's Decision To Decline Life-Saving Medical Treatment: Bodily Integrity Versus The Preservation of Life," 26 *Rutgers L. Rev.* 228 (1973) ; Claypool, "The Family Deals with Death," 27 *Baylor L. Rev.* 34 (1975) ; Elkington, "The Dying Patient, The Doctor and The Law," 13 *Vill. L. Rev.* 740 (1968) ; Fletcher, "Legal Aspects of the Decision Not to Prolong Life," 203 *J. A. M. A.* 65 (1968) ; Foreman, "The Physician's Criminal Liability for the Practice of Euthanasia," 27 *Baylor L. Rev.* 54 (1975) ; Gurney, "Is There A Right To Die? — A Study of

The wide debate thus reflected contrasts with the relative paucity of legislative and judicial guides and standards in the same field. The medical profession has sought to devise guidelines such as the "brain death" concept of the Harvard Ad Hoc Committee mentioned above. But it is perfectly apparent from the testimony we have quoted of Dr. Korein, and indeed so clear as almost to be judicially noticeable, that humane decisions against resuscitative or maintenance therapy are frequently a recognized *de facto* response in the medical world to the irreversible, terminal, pain-ridden patient, especially with familial consent. And these cases, of course, are far short of "brain death."

We glean from the record here that physicians distinguish between curing the ill and comforting and easing the dying; that they refuse to treat the curable as if they were dying or ought to die, and that they have sometimes refused to treat the hopeless and dying as if they were curable. In this sense, as we were reminded by the testimony of Drs. Korein and Diamond, many of them have refused to inflict an undesired prolongation of the process of dying on a patient in irreversible condition when it is clear that such "therapy" offers neither human nor humane benefit. We think these attitudes represent a balanced implementation of a profoundly realistic perspective on the meaning of life and death and that they respect the whole Judeo-Christian tradition of regard for human life. No less would they seem consistent with the moral matrix of medicine, "to heal,"

the Law of Euthanasia," 3 *Cumb.-Sam. L. Rev.* 235 (1972) ; Mannes, "Euthanasia vs. The Right To Life," 27 *Baylor L. Rev.* 68 (1975) ; Sharp & Crofts, "Death with Dignity and The Physician's Civil Liability," 27 *Baylor L. Rev.* 86 (1975) ; Sharpe & Hargest, "Life-saving Treatment for Unwilling Patients," 36 *Fordham L. Rev.* 695 (1968) ; Skegg, "Irreversibly Comatose Individuals: 'Alive' or 'Dead'?," 33 *Camb. L. J.* 130 (1974) ; Comment, "The Right to Die," 7 *Houston L. Rev.* 654 (1970) ; Note, "The Time of Death — A Legal, Ethical and Medical Dilemma," 18 *Catholic Law.* 243 (1972) ; Note, "Compulsory Medical Treatment: The State's Interest Re-evaluated," 51 *Minn. L. Rev.* 293 (1966).

very much in the sense of the endless mission of the law, "to do justice."

Yet this balance, we feel, is particularly difficult to perceive and apply in the context of the development by advanced technology of sophisticated and artificial life-sustaining devices. For those possibly curable, such devices are of great value, and, as ordinary medical procedures, are essential. Consequently, as pointed out by Dr. Diamond, they are necessary because of the ethic of medical practice. But in light of the situation in the present case (while the record here is somewhat hazy in distinguishing between "ordinary" and "extraordinary" measures), one would have to think that the use of the same respirator or like support could be considered "ordinary" in the context of the possibly curable patient but "extraordinary" in the context of the forced sustaining by cardio-respiratory processes of an irreversibly doomed patient. And this dilemma is sharpened in the face of the malpractice and criminal action threat which we have mentioned.

We would hesitate, in this imperfect world, to propose as to physicians that type of immunity which from the early common law has surrounded judges and grand jurors, *see, e. g., Grove v. Van Duyn,* 44 *N. J. L.* 654, 656–57 (E. & A. 1882); *O'Regan v. Schermerhorn,* 25 *N. J. Misc.* 1, 19–20 (Sup. Ct. 1940), so that they might without fear of personal retaliation perform their judicial duties with independent objectivity. In *Bradley v. Fisher,* 80 *U. S.* (13 *Wall.*) 335, 347, 20 *L. Ed.* 646, 649 (1872), the Supreme Court held:

[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.

Lord Coke said of judges that "they are only to make an account to God and the King [the State]." 12 *Coke Rep.* 23, 25, 77 *Eng. Rep.* 1305, 1307 (S. C. 1608).

Nevertheless, there must be a way to free physicians, in the pursuit of their healing vocation, from possible contamination by self-interest or self-protection concerns which would inhibit their independent medical judgments for the well-being of their dying patients. We would hope that this opinion might be serviceable to some degree in ameliorating the professional problems under discussion.

A technique aimed at the underlying difficulty (though in a somewhat broader context) is described by Dr. Karen Teel, a pediatrician and a director of Pediatric Education, who writes in the *Baylor Law Review* under the title "The Physician's Dilemma: A Doctor's View: What The Law Should Be." Dr. Teel recalls:

Physicians, by virtue of their responsibility for medical judgments are, partly by choice and partly by default, charged with the responsibility of making ethical judgments which we are sometimes ill-equipped to make. We are not always morally and legally authorized to make them. The physician is thereby assuming a civil and criminal liability that, as often as not, he does not even realize as a factor in his decision. There is little or no dialogue in this whole process. The physician assumes that his judgment is called for and, in good faith, he acts. Someone must and it has been the physician who has assumed the responsibility and the risk.

I suggest that it would be more appropriate to provide a regular forum for more input and dialogue in individual situations and to allow the responsibility of these judgments to be shared. Many hospitals have established an Ethics Committee composed of physicians, social workers, attorneys, and theologians, * * * which serves to review the individual circumstances of ethical dilemma and which has provided much in the way of assistance and safeguards for patients and their medical caretakers. Generally, the authority of these committees is primarily restricted to the hospital setting and their official status is more that of an advisory body than of an enforcing body.

The concept of an Ethics Committee which has this kind of organization and is readily accessible to those persons rendering medical care to patients, would be, I think, the most promising direction for further study at this point. * * *

* * * [This would allow] some much needed dialogue regarding these issues and [force] the point of exploring all of the options for a particular patient. It diffuses the responsibility for making these judgments. Many physicians, in many circumstances, would welcome this sharing of responsibility. I believe that such an entity could

lend itself well to an assumption of a legal status which would allow courses of action not now undertaken because of the concern for liability. [27 *Baylor L. Rev.* 6; 8–9 (1975)].

The most appealing factor in the technique suggested by Dr. Teel seems to us to be the diffusion of professional responsibility for decision, comparable in a way to the value of multi-judge courts in finally resolving on appeal difficult questions of law. Moreover, such a system would be protective to the hospital as well as the doctor in screening out, so to speak, a case which might be contaminated by less than worthy motivations of family or physician. In the real world and in relationship to the momentous decision contemplated, the value of additional views and diverse knowledge is apparent.

We consider that a practice of applying to a court to confirm such decisions would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be impossibly cumbersome. Such a requirement is distinguishable from the judicial overview traditionally required in other matters such as the adjudication and commitment of mental incompetents. This is not to say that in the case of an otherwise justiciable controversy access to the courts would be foreclosed; we speak rather of a general practice and procedure.

And although the deliberations and decisions which we describe would be professional in nature they should obviously include at some stage the feelings of the family of an incompetent relative. Decision-making within health care if it is considered as an expression of a primary obligation of the physician, *primum non nocere,* should be controlled primarily within the patient-doctor-family relationship, as indeed was recognized by Judge Muir in his supplemental opinion of November 12, 1975.

If there could be created not necessarily this particular system but some reasonable counterpart, we would have no

doubt that such decisions, thus determined to be in accordance with medical practice and prevailing standards, would be accepted by society and by the courts, at least in cases comparable to that of Karen Quinlan.

The evidence in this case convinces us that the focal point of decision should be the prognosis as to the reasonable possibility of return to cognitive and sapient life, as distinguished from the forced continuance of that biological vegetative existence to which Karen seems to be doomed.

In summary of the present Point of this opinion, we conclude that the state of the pertinent medical standards and practices which guided the attending physicians in this matter is not such as would justify this Court in deeming itself bound or controlled thereby in responding to the case for declaratory relief established by the parties on the record before us.

## V. *Alleged Criminal Liability*

Having concluded that there is a right of privacy that might permit termination of treatment in the circumstances of this case, we turn to consider the relationship of the exercise of that right to the criminal law. We are aware that such termination of treatment would accelerate Karen's death. The County Prosecutor and the Attorney General maintain that there would be criminal liability for such acceleration. Under the statutes of this State, the unlawful killing of another human being is criminal homicide. *N. J. S. A.* 2A:113-1, 2, 5. We conclude that there would be no criminal homicide in the circumstances of this case. We believe, first, that the ensuing death would not be homicide but rather expiration from existing natural causes. Secondly, even if it were to be regarded as homicide, it would not be unlawful.

These conclusions rest upon definitional and constitutional bases. The termination of treatment pursuant to the right of privacy is, within the limitations of this case, *ipso facto*

lawful. Thus, a death resulting from such an act would not come within the scope of the homicide statutes proscribing only the unlawful killing of another. There is a real and in this case determinative distinction between the unlawful taking of the life of another and the ending of artificial life-support systems as a matter of self-determination.

Furthermore, the exercise of a constitutional right such as we have here found is protected from criminal prosecution. *See Stanley v. Georgia, supra,* 394 *U. S.* at 559, 89 *S. Ct.* at 1245, 22 *L. Ed.* 2d at 546. We do not question the State's undoubted power to punish the taking of human life, but that power does not encompass individuals terminating medical treatment pursuant to their right of privacy. *See id.* at 568, 89 *S. Ct.* at 1250, 22 *L. Ed.* 2d at 551. The constitutional protection extends to third parties whose action is necessary to effectuate the exercise of that right where the individuals themselves would not be subject to prosecution or the third parties are charged as accessories to an act which could not be a crime. *Eisenstadt v. Baird, supra,* 405 *U. S.* at 445–46, 92 *S. Ct.* at 1034–35, 31 *L. Ed.* 2d at 357–58; *Griswold v. Connecticut, supra,* 381 *U. S.* at 481, 85 *S. Ct.* at 1679–80, 14 *L. Ed.* 2d at 512–13. And, under the circumstances of this case, these same principles would apply to and negate a valid prosecution for attempted suicide were there still such a crime in this State.[9]

---

[9]An attempt to commit suicide was an indictable offense at common law and as such was indictable in this State as a common law misdemeanor. 1 *Schlosser, Criminal Laws of New Jersey* § 12.5 (3d ed. 1970) ; *see N. J. S. A.* 2A :85–1. The legislature downgraded the offense in 1957 to the status of a disorderly persons offense, which is not a "crime" under our law. *N. J. S. A.* 2A :170–25.6. And in 1971, the legislature repealed all criminal sanctions for attempted suicide. *N. J. S. A.* 2A :85–5.1. Provision is now made for temporary hospitalization of persons making such an attempt. *N. J. S. A.* 30 :4–26.3a. We note that under the proposed New Jersey Penal Code (Oct. 1971) there is no provision for criminal punishment of attempted suicide. *See* Commentary, § 2C :11–6. There is,

## VI. *The Guardianship of the Person*

██ The trial judge bifurcated the guardianship, as we have noted, refusing to appoint Joseph Quinlan to be guardian of the person and limiting his guardianship to that of the property of his daughter. Such occasional division of guardianship, as between responsibility for the person and the property of an incompetent person, has roots deep in the common law and was well within the jurisdictional capacity of the trial judge. *In re Rollins*, 65 A. 2d 667, 679–82 (N. J. Cty. Ct. 1949).

The statute creates an initial presumption of entitlement to guardianship in the next of kin, for it provides:

> In any case where a guardian is to be appointed, letters of guardianship shall be granted * * * to the next of kin, or if * * * it is proven to the court that no appointment from among them will be to the best interest of the incompetent or his estate, then to such other proper person as will accept the same. [*N. J. S. A.* 3A: 6–36. *See In re Roll*, 117 *N. J. Super.* 122, 124 (App. Div. 1971)].

██ The trial court was apparently convinced of the high character of Joseph Quinlan and his general suitability as guardian under other circumstances, describing him as "very sincere, moral, ethical and religious." The court felt, however, that the obligation to concur in the medical care and treatment of his daughter would be a source of anguish to him and would distort his "decision-making processes." We disagree, for we sense from the whole record before us that while Mr. Quinlan feels a natural grief, and understandably sorrows because of the tragedy which has befallen his daughter, his strength of purpose and character far outweighs these sentiments and qualifies him eminently for guardianship of the person as well as the property of his daughter. Hence we discern no valid reason to overrule the statutory intendment of preference to the next of kin.

---

however, an independent offense of "aiding suicide." § 2C:11–6b. This provision, if enacted, would not be incriminatory in circumstances similar to those presented in this case.

## DECLARATORY RELIEF

We thus arrive at the formulation of the declaratory relief which we have concluded is appropriate to this case. Some time has passed since Karen's physical and mental condition was described to the Court. At that time her continuing deterioration was plainly projected. Since the record has not been expanded we assume that she is now even more fragile and nearer to death than she was then. Since her present treating physicians may give reconsideration to her present posture in the light of this opinion, and since we are transferring to the plaintiff as guardian the choice of the attending physician and therefore other physicians may be in charge of the case who may take a different view from that of the present attending physicians, we herewith declare the following affirmative relief on behalf of the plaintiff. Upon the concurrence of the guardian and family of Karen, should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life-support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital "Ethics Committee" or like body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life-support system may be withdrawn and said action shall be without any civil or criminal liability therefor on the part of any participant, whether guardian, physician, hospital or others.[10] We herewith specifically so hold.

---

[10]The declaratory relief we here award is not intended to imply that the principles enunciated in this case might not be applicable in divers other types of terminal medical situations such as those described by Drs. Korein and Diamond, *supra*, not necessarily involving the hopeless loss of cognitive or sapient life.

## CONCLUSION -

We therefore remand this record to the trial court to implement (without further testimonial hearing) the following decisions:

1. To discharge, with the thanks of the Court for his service, the present guardian of the person of Karen Quinlan, Thomas R. Curtin, Esquire, a member of the Bar and an officer of the court.

2. To appoint Joseph Quinlan as guardian of the person of Karen Quinlan with full power to make decisions with regard to the identity of her treating physicians.

We repeat for the sake of emphasis and clarity that upon the concurrence of the guardian and family of Karen, should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life-support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital "Ethics Committee" or like body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life-support system may be withdrawn and said action shall be without any civil or criminal liability therefor, on the part of any participant, whether guardian, physician, hospital or others.

By the above ruling we do not intend to be understood as implying that a proceeding for judicial declaratory relief is necessarily required for the implementation of comparable decisions in the field of medical practice.

Modified and remanded.

*For modification and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*Opposed*—None.