**In the Matter of Anna M. GORDY, a disabled person.**

**No. C.M. 7428.**

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 20, 1994.
Decided: Dec. 30, 1994.

David J. Lyons, of Aerenson, Ferrara & Lyons, Wilmington, for petitioner.

William L. Garrett, Jr., Wilmington, Guardian Ad Litem.

A. Ann Wolfolk, Deputy Atty. Gen., Dept. of Justice, Wilmington, for Emily P. Bissell Hosp.

## OPINION

ALLEN, Chancellor.

Pending is an application for the appointment of a guardian of the person of Anna M. Gordy, a 96 year-old resident of the Emily P. Bissell Hospital. The petitioner is James Davis, the elder of Mrs. Gordy's two children. Mr. Davis seeks his designation as guardian so that he may be legally enabled to deny to the Bissell Hospital consent to the surgical insertion in his mother's abdomen of a gastric feeding tube. Based upon a living will that Mrs. Gordy executed a few years ago, and on her statements over the years and currently, Mr. Davis believes that his mother does not or would not wish this step to be taken. The court appointed an attorney to serve as guardian ad litem for Mrs. Gordy. His report to the court recommends the granting of the relief that Mr. Davis seeks. The Attorney General, however, disagrees. He objects to Mr. Davis' proposal. While the Attorney General agrees that if Mrs. Gordy is legally competent her authori-

ty over her own health care decisions is conclusive, he asserts that she is not competent at this time. Moreover the Attorney General believes that in the circumstances presented it is in Mrs. Gordy's interest to have the gastric feeding tube inserted. Thus the Attorney General asks that this court appoint Mr. Davis guardian of his mother, but asserts that it should direct him to consent to the insertion of the gastric feeding tube.

The pending application thus raises two principal issues. The first is whether by reason of her advanced years and the deterioration that accompanies great age Mrs. Gordy is no longer competent to make decisions respecting her own health care. If she is determined not to be competent in this sense, then it is agreed that James Davis is an appropriate person to be granted legal power to make decisions respecting his mother's person. The second question assumes that a guardian is appointed. It is whether, in the circumstances, the guardian may, consistently with the best interests of the ward and with his legal obligations, refuse to authorize the insertion of a gastric feeding tube necessary to assure to Mrs. Gordy continued adequate nutrition.

Among the most difficult questions presented in late twentieth century law are those that arise from the social effects of new health care technologies that extend our ability to sustain life both at its earliest and at its last stages. Such questions may touch upon our most profound values; sometimes bringing them into conflict in settings that are unfamiliar. In response to such problems courts may be required by duty to try to deal with questions that do not have non-controversial answers. When does distinctively human life—life deserving or demanding the protection of law—begin and when does it end? Who gets to decide? And by what standards are such determinations to be made? Courts are imperfect institutions for resolving such questions, but that fact does not excuse a court from the responsibility to decide actual cases as they are properly presented to it. Thus, mindful of institutional limitations and the importance of the subject, I turn to the facts of this case.

## I.

Anna M. Gordy has been a patient at the Emily P. Bissell Hospital for approximately two years. Despite her advanced age, and aside from the matter that caused this petition to be filed, Mrs. Gordy appears to enjoy good health for a person of her advanced years. Over recent years she has suffered some subdural hematomas as a result of falls and she has required the implantation of a pacemaker to deal with a heart problem, but she does not have a long list of medical problems as is often encountered with the very, very old. Mrs. Gordy has suffered some loss of cognitive ability in recent years, but continues to be sufficiently alert to engage in conversation with her sons, who regularly visit her, and with medical and nursing staff. It is the opinion of medical professionals that she suffers from Alzheimer's disease. This disease causes a loss of brain function gradually leading first to a change in personality and then to a loss of upper brain function. In its final stages (if another cause of death does not intervene) more primitive brain functions are lost as well. One of these primitive reflexes that are lost in the last stages of Alzheimer's disease is the swallowing reflex. Thus, unless something else intervenes, starvation may be a cause of death in end-stage Alzheimer's patients.[1]

Mrs. Gordy's Alzheimer's disease is not at that stage, however. She is at the earlier stage in which upper brain function is eroding. She is not, however, eating sufficiently to maintain her weight or to sustain her life.

Mrs. Gordy does eat, but only in limited quantities and with the aid of a nurse or other member of the hospital staff. She seems to have a very difficult time eating solid food and states that she is not hungry. Psychiatrists and a medical doctor proffered a variety of reasons for her inability or unwillingness to eat, ranging from her neurological disease, depression, to discomfort in chewing. If her nutritional deficiencies are not promptly remedied or reversed, she is expected to die soon, perhaps within a few weeks. If through the insertion of a gastric feeding tube or otherwise, she does begin to take sufficient nourishment and is rehydrated, the testimony is that she could live for a number of years. Increased nourishment would not be expected to alter the course of her Alzheimer's disease, however. Thus medical testimony indicates that at some point in the future, she would be in a completely vegetative state. At this point the gastric feeding tube could sustain her vegetative life for a further period than would otherwise occur.

Mrs. Gordy has repeatedly stated her desire not to be sustained through tube feeding. Within the last few weeks, she has voiced her opposition when asked questions concerning the insertion of a feeding tube by a psychiatrist, an attorney serving as her guardian *ad litem,* and a representative of the State Division of Aging, Ombudsman's office, all of whom made inquiries in connection with this action. More formally in 1990 Mrs. Gordy executed a document entitled "Living Will, Right To Natural Death" in which she expressly rejected the use of a feeding tube in the event that she had a terminal illness as diagnosed by two physicians. The same document expressly repudiates many other life support processes, including even cardiopulmonary resuscitation and antibiotics. Mrs. Gordy's determination to avoid a feeding tube is clearly manifested in her living will

---

1. Death by starvation no doubt seems to many of us an exceptionally cruel and painful lingering death. *See, e.g., Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 274, 110 S.Ct. 2841, 2849, 111 L.Ed.2d 224 (1990) (citing *In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985)). In fact recent medical research suggests that where terminally ill patients are involved this supposition is incorrect. *See* Robert M. McCann et al., *Comfort Care for Terminally Ill Patients: The Appropriate Use of Nutrition and Hydration,* 272 J.Am.Med.Assn. 1263 (October 26, 1994). This study involved 32 terminal cancer patients all of whom expressed a desire not to be fed or given liquids through tubes. They were allowed to eat and drink as they chose but gradually chose to eat little. The study reports that while these patients lost their appetites, the resulting starvation seemed to ease their pain and suffering. The report of this study published in the New York Times quoted Dr. Ann Marie Groth–Juncker, one of the authors of the study: "People dying of diseases other than cancer, Alzheimer's among them, have the same experience", said Dr. Groth–Juncker.... "This is, of course, how people have always died, before there were hospitals with IV's and feeding tubes". N.Y. Times, Oct. 26, 1994, p. 20 col. 1.

where she not only initialed that she did not want "artificial nutrition and hydration (nourishment provided by a feeding tube)" used, but took the further step of writing the word "No" next to her initials. The court has not been presented with any evidence indicating that Mrs. Gordy was not fully competent when she initialed and signed the living will.[2]

Concerning the extent of Mrs. Gordy's current understanding, I note that when psychiatrist Gregory Villabona asked her about the nature of the tube to be inserted, she replied "It is like a hose that they put in you to put food in...." Resp't. Ex. 1. When Dr. Villabona asked her why the doctors wanted to insert the tube, she replied "I don't want to eat and they think it is the wise thing to do." *Id.* When he asked what would happen if they did not insert the tube, she responded "I might die." *Id.* And finally when he asked if she wanted the tube to be inserted, she said "No, I don't." *Id.* Likewise when attorney William L. Garrett, Jr., Mrs. Gordy's guardian *ad litem*, visited her and asked whether she would want a tube to feed her if she needed to be fed by that method to stay alive, she responded "I don't." Garrett, Aff'd. ¶ 18. When asked if she was certain of this response, she said "I'm sure. I know what I want to eat and I eat what I want." *Id.* There is no evidence that Mrs. Gordy ever has retracted her statements that she does not want a feeding tube or ever has contradicted her position.[3]

She has stated, however, that she wants to live. I do not regard these two statements as inconsistent. Rather I interpret them consistently to mean that Mrs. Gordy wants to live but not at the price of being fed through a gastric feeding tube. I accept for these purposes that if no feeding tube is implanted into Mrs. Gordy that she is likely to die as a result of starvation within a relatively short time.

Two psychiatrists, Drs. Cantrell and Dhanjani, who questioned Mrs. Gordy concluded that she is incompetent to give "informed consent" at this time to the withholding of a gastric feeding tube. These opinions were based principally upon the conclusion that Anna Gordy suffers from depression, from organic brain syndrome or from Alzheimer's disease resulting in diminished cognition and frequent confusion, and upon the view that Mrs. Gordy's statement that she would prefer to live is inconsistent with her expressed desire to resist the insertion of a gastric feeding tube. Dr. Villabona, on the other hand, expresses the view that Mrs. Gordy "demonstrated that she understood the consequences of her refusal not only of the procedure but of her limited food intake" and that she "has made an informed decision when she refuses tube placement." [4] Resp't. Ex. 1. Finally, Dr. Sherwood, the medical director of the Bissell Hospital, testified that he considered Mrs. Gordy to be terminally ill due to her neurological disease; that he considered Mrs. Gordy to be severely ill-suited for a gastric tube because her dementia would likely cause her to painfully rip the tube out of her body; and that he would *not* recommend insertion of the tube.

## II.

The first question presented is whether Mrs. Gordy is, by reason of "mental incapacity, ... in danger of substantially endangering [her] health". 12 *Del.C.* § 3901 (1994). On this question, as the foregoing indicates, the evidentiary record is in conflict. Certainly on such a question the burden of proof and the burden of persuasion must be upon that party attempting to deprive another of the basic liberty entailed in one's con-

---

2. In fact the living will was witnessed by two representatives of the State Division of Aging who attested that they each believed Mrs. Gordy to be of "sound mind." *See* Pet. for Appointment of Guardian of the Person Pursuant to Chancery Court Rule 175(c) and 12 Del.C. § 3901, Exh. C.

3. The most equivocal remark Mrs. Gordy has made with regards to the feeding tube was in response to psychiatrist Dr. Cantrell's questions concerning whether Mrs. Gordy would consider

being fitted with a feeding tube if the doctors recommended it. She replied "I might, but probably not."

4. The State points out that Dr. Villabona qualified his findings as possibly being flawed because he only met with Mrs. Gordy one time. Drs. Cantrell and Dhanjani also, however, only met Mrs. Gordy a single time.

trol over the medical treatment that one undergoes. *Brittingham v. Robertson,* Del. Ch. 280 A.2d 741 (1971).

Plainly the decision to decline the insertion of a gastric feeding tube will in these circumstances place Mrs. Gordy in increased danger of death. But, while that decision is the result of a mind that has suffered cognitive losses (i.e. is less capable than it was), is her decision to decline that intrusive therapy a result of "mental incapacity"? To formulate an answer to that question requires one to define what is meant by a mental incapacity in this context. That is a problematic undertaking, as we all have mental incapacities of various types. Some of us are able to learn foreign languages; for others it seems too difficult; for some calculus (or quantum physics) is beyond us. In some sense mental incapacity is simply the human condition.[5]

■ Unavoidably a judgment about a person's "mental incapacity" will call for a comparative judicial judgment made on the particular facts of each case. In order to structure and inform the inquiry leading to that judgment in this case, I apply the following legal test of "mental incapacity" as used in § 3901. In my opinion the mental incapacity to which § 3901 refers includes (1) a pattern demonstrating an inability to recognize as relevant to decisions of significance, facts or considerations that one would expect reasonable and competent persons to recognize as relevant to such a decision; (2) a pattern demonstrating an inability to reason with respect to decisions that are relatively simple but personally important, in a way that is internally consistent; or (3) the presence of a mental disease or condition that interferes with the operation of the prospective ward's perceptions or reasoning to such an extent as to raise a substantial likelihood that decisions relating to matters of importance to her have been affected by that mental disease or condition. While there is a certain degree of redundancy incorporated into the third element of this test, it more easily accommodates professional medical opinion evidence and evidence of past susceptibility to overreaching and thus is, in my opinion, a useful additional ground for a finding of "mental incapacity" for guardianship purposes.

■ Applying this test to the evidence of record leads me to the conclusion that no party has demonstrated (1) that Mrs. Gordy's decision to refuse the insertion of a gastric feeding tube is the result of an inability to recognize facts relevant to or consequences of that decision; (2) that she is unable to reason with respect to that simple if profound decision; or (3) that there is a substantial likelihood that her diagnosed Alzheimer's condition has affected that decision. The last of these conclusions is the one that is most contestable. The testimony that Mrs. Gordy has lost a great deal of her cognitive competency is strong, and the seriousness of her decision is such that the effects of that loss should be carefully considered. Nevertheless I find Dr. Villabona's expressed view that Mrs. Gordy was capable of giving informed consent to the surgical procedure to be the more persuasive medical view. Most important in corroborating that view is the fact that Mrs. Gordy has maintained that position for some years, clearly expressing in her 1990 living will the direction that no gastric feeding tube be implanted in her.[6]

---

5. The mental incapacity standard in § 3901 was introduced into Delaware law in a codification and consolidation of the statutory law governing guardianships and trustees for mentally ill persons drafted by Court of Chancery Fiduciary Rules Committee and enacted by the General Assembly in 1993. *See* 69 *Del.Laws,* c. 109 (1993). While it is not my belief that there was a specific intention to change the substantive law with respect to guardianships in this amendment, nevertheless henceforth it is that language to which attention must be given. *Compare* 12 *Del.C.* § 3914 (1987) ("by reason of advanced age or mental infirmity ...").

6. The Attorney General contends that that document is irrelevant at this time because its effect is conditioned upon the signer being in a terminal state. Notwithstanding that fact, I consider the living will to be powerful corroborative evidence of her wishes now. First Dr. Sherwood, the Medical Director of the Bissell Hospital, has opined that Mrs. Gordy's Alzheimer's disease will cause her death and that she is now in a terminal condition, even though with the gastric feeding tube her biological life could be sustained for some additional period. Secondly, and more importantly, all of the evidence reflects a complete resistance to the idea of artificial feeding to prolong life. Surely the witnessed living will is the most formal part of that evidence supporting

Moreover the testimony of the representative of the State Ombudsman's office, the affidavit of the guardian *ad litem*, and the testimony of the petitioner all in different respects support Dr. Villabona's conclusion. All of these witnesses no doubt took into account the fact that Mrs. Gordy's decision appears in the circumstances to be neither irrational or uninformed.

Based upon my evaluation of the evidence I conclude that Anna Gordy is not presently suffering from a "mental incapacity" that is endangering her health. Rather I conclude that she has made a rational choice concerning her medical treatment at the end of her very long life that deserves to be respected.

### III.

While the evidence convinces me of the foregoing, it is nevertheless the case that Mrs. Gordy suffers from a degenerative disease that is debilitating her cognitive abilities and that she suffers as well from the physical losses and inabilities that normally accompany very great age. Thus it is clear that at some point, perhaps very soon, she will no longer have sufficient residual mental capacity to make decisions that deserve respect concerning her own care and it is clear in this case that the appropriate person to make those decisions, under the appropriate legal standard, is the petitioner. Thus, because Mrs. Gordy is plainly suffering currently from "physical incapacity" that renders her "unable to properly manage or care for her person", I conclude that, notwithstanding the foregoing analysis of Mrs. Gordy's "mental incapacity," § 3901 authorizes the appointment of James Davis as his mother's guardian at this time.

\* \* \*

In exercising its general superintendence over guardians of aged or incompetent persons the Court of Chancery may instruct such fiduciaries in the exercise of their duties. Both the court in its supervisory role and the guardian in his or her primary role, are bound to advance the best interest of the ward.[7] The best interests of the ward is a standard that attempts in the first instance to replicate the decisions that the ward herself would make in the circumstances present, if she did not suffer from diminished mental capacity or physical incapacity.[8]

In considering the best interests of the ward, it is elementary that sustaining life itself is an interest of very great value. But life itself is not the only value that any of us hold. We are social creatures to lesser or greater degrees concerned about others, as well as ourselves; we are concerned to advance chosen values; and we value our dignity, as well as our ability to experience the joys and benefits of living. Because our biologic life is not our only value, in considering the interests of an incompetent person, biologic life need not be the exclusive focus of the guardian's attention or of the court to which the guardian must answer. Thus, in an appropriate case, the court may even authorize a guardian to discontinue life supporting medical treatment if, after hearing evidence, it is determined to be in the best interests of the ward to do so. *Severns v. Wilmington Medical Center, Inc.,* Del.Supr., 421 A.2d 1334 (1980). Less drastic, but no less permissible are good faith decisions to

---

Mrs. Gordy's decision to decline tube feeding, but it is not the only such evidence. Even if for some reason one sought to give the living will a very narrow interpretation, it nevertheless would offer corroboration for the view that Mrs. Gordy's recent statements resisting a feeding tube were not the result of her diminished capacity.

**7.** *See In re Rick,* Del.Ch., C.A. No. 6920, Chandler, V.C., 1994 WL 148268 (Mar. 23, 1994); *In re Price,* Del.Ch., C.A. No. 6830, Allen, C., 1992 WL 396308 (Dec. 29, 1992); *In re Roemer,* Del. Ch., C.A. No. 6586, Jacobs, V.C., 1992 WL 127560 (May 28, 1992). (All appointing the guardian who was found to be in the best interests of the ward).

**8.** The terms used to label this standard have varied, but courts have not wavered in requiring that if the ward's judgment or desire concerning her right to terminate medical treatment can be determined, then that judgment or desire should be deferred to. *See, e.g., Cruzan v. Harmon,* 760 S.W.2d 408 (Mo.1988) (en banc); *In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985); *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied sub nom. Garger v. New Jersey,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). Courts have differed, however, on the evidentiary burden necessary to establish that fact.

decline on behalf of a ward extraordinary medical treatments, including nutrition and hydration when they entail invasive procedures. Indeed, this court has held that a guardian's decision to forego the initiation of extraordinary medical treatments (e.g. the entry of a Do Not Resuscitate ("DNR") order) does not necessarily require the same procedures as the entry of an order terminating life sustaining treatments would. *See In the Matter of Elsie Pesta,* an Infirm Person, Del.Ch., C.M. 6337 (Oct. 15, 1991). In some cases, this court has exercised judicial judgment to authorize the entry of a DNR order by an existing guardian upon application supported by two physicians affidavits. *In Re Mary Nagy,* Del.Ch., C.M. 6605 (Oct. 18, 1992) (bench ruling). In all such instances, as here, the guardian and the appointing court are required to act only in the best interests of the ward, as that appears in the particular case.

\* \* \*

In attempting to meet the best interest standard in the context of health care decisions especially, a guardian is obligated to give consideration to the views of the ward herself, if the ward is in a position to consider such matters rationally (as she ordinarily will be where a guardianship is necessitated only by physical incapacity). *See* n. 8, *supra.* Since, in this instance, I conclude that it is appropriate to appoint petitioner as guardian of the person of his mother, only because she is physically incapable of managing or caring for her person, this principle has application at this time to this matter.

The testimony establishes, however, that Mrs. Gordy is suffering from a debilitating disease that will, perhaps shortly, render her mentally incapable of making decisions regarding her care. It would be essential that a guardian be available then, at the latest, to make health care decisions for her. As a consequence of the order I will enter on this application appointing James Davis as guardian of his mother, Mr. Davis will be in a position legally to make health care decisions for his mother from this time forward. He will be specifically authorized to follow his mother's expressed direction to decline the surgical implantation of a gastric feeding tube and to make such other heath care decisions as are, in his good faith judgment, in the best interest of Anna Gordy.

Petitioner shall submit a form of implementing order, promptly, on notice to respondent.