**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN THE MATTER OF M.D.J.,    )        C.M. No. 20894-K-CDW
a person with an alleged disability.    )

**ORDER DENYING**
**PETITION FOR GUARDIANSHIP**

**WHEREAS:**

A.     On May 21, 2025, T.D.J. ("Petitioner") filed a verified petition seeking appointment as guardian of the person and property of his father, M.D.J. ("Mr. J."). Dkt. 1 ("Petition").

B.     On May 27, the court issued an amended preliminary order appointing David Bever as attorney *ad litem* ("First Attorney *Ad Litem*") and scheduling a hearing on the Petition for July 3. Dkt. 2.

C.     On June 27, the First Attorney *Ad Litem* filed his report. Dkt. 3 ("AAL Report").

D.     In the AAL Report, the First Attorney *Ad Litem* recommended that the court grant the Petition, *id.* ¶¶ 41–44, and noted that Mr. J. objected to the Petition, *id.* ¶¶ 18–19, 42.

E.     On August 4, the court appointed Thomas Reichert, Esquire as the second attorney *ad litem* on behalf of Mr. J. as if engaged by Mr. J. ("Second Attorney *Ad Litem*"), under Court of Chancery Rule 176(a). Dkt. 9.

F.	On August 6, this matter was assigned to the undersigned Magistrate in Chancery.  Dkt. 10.

G.	On September 5, the court scheduled the Petition for a half-day virtual evidentiary hearing via Zoom on October 16 ("Hearing").  Dkt. 11.

H.	On October 9, Mr. J., through the Second Attorney *Ad Litem*, filed his List of Potential Witnesses and Exhibits for the October 16, 2025 Hearing.  Dkt. 13.  Mr. J. identified himself as a potential witness and identified 11 potential exhibits.  *Id.*

I.	Also on October 9, Petitioner filed his Witness List For Upcoming Hearing/Trial, Dkt. 14, and requested issuance of subpoenas to compel three individuals to testify at the evidentiary hearing, Dkt. 15.

J.	On October 16, the court held the Hearing.  Dkt. 22.  The court heard testimony from five witnesses:  (1) Petitioner; (2) C.S., the business office manager at Skilled Nursing Facility ("SNF") in Milford; (3) B.D., the administrator at SNF's Milford location; (4) Dr. B., a physician at SNF who has been treating Mr. J.; and (5) Mr. J.  *Id.* at 2–3.  Petitioner, the First Attorney *Ad Litem*, and Mr. J. (through the Second Attorney *Ad Litem*) each had the opportunity to (and did) question the witnesses.  This is a summary of their testimony:

1. Petitioner was the first witness. He testified that he filed for guardianship of Mr. J. due to concerns about Mr. J.'s ability to care for himself following a fall that resulted in significant injuries, hospitalization, and a long rehabilitation. Petitioner expressed significant concern about Mr. J.'s living conditions, including poor hygiene and incidents involving the unsafe use of firearms. Petitioner also expressed concern about Mr. J.'s cognitive state and his ability to manage his finances on his own. Petitioner cannot provide full time care to Mr. J. himself. He believes that Mr. J. cannot live on his own, which is problematic because Mr. J.'s insurance will not cover a home health aide and Mr. J. refuses to consider moving into assisted living facility. Throughout the Hearing, Petitioner emphasized, quite convincingly, that he is trying to help Mr. J. as best he can and only has Mr. J.'s best interests in mind.

2. C.S. was the next witness. She testified that Mr. J., during his stay at SNF, has called the police many times claiming that SNF is refusing to feed him, is holding him against his will, and is stealing his belongings. She testified that his awareness and understanding of his environment is better in the morning, and that the more negative interactions tend to be later in the day. C.S. testified about the

difficulties Petitioner and SNF have had trying to help Mr. J. qualify for Medicaid, and she testified to some of Mr. J.'s personal care issues, such as refusing haircuts and showers.

3. B.D. testified next. She explained that Mr. J. has made tremendous physical improvement since arriving at SNF in April and said she believes his cognitive status has stayed consistent. Like C.S., she testified about Mr. J.'s calls to the police, noting that the calls essentially stopped once Mr. J. was moved to a private room in another part of SNF with a "different atmosphere" where it is "a little quieter and less hectic." She believes Mr. J. would "thrive" in an assisted living facility, and it "would not be a good idea" for him to be living at home because she has concerns about Mr. J. feeding himself, taking his medications properly, and interacting with other people (which the court interprets to mean a susceptibility to scams).

4. Dr. B. was the fourth witness. He testified that when Mr. J. first arrived at SNF in April he was oriented to time and place but did not remember Dr. B. on subsequent visits, and needed assistance with the activities of daily living. He explained that it is "very difficult" to have conversations with Mr. J. "because he refuses a lot of his medications," but when Mr. J. did take his medications "his behaviors

were not as combative, fighting, or anything like that." Dr. B. noted that Mr. J. typically refuses to take his anxiety and depression medications, and stated that Mr. J. not taking his medications when prescribed and as directed would eventually have negative health consequences.

5.      Dr. B. also testified that he would have no reason to doubt the accuracy of the skilled nursing notes produced by SNF for June and July if they no longer stated that Mr. J. had occasional confusion, like the April and May notes did. Dr. B. also testified about a April 2025 screening form prepared by Hospital[1] which noted no negative mental health diagnosis for Mr. J., including dementia or another neurocognitive disorder, and said that the absence of any subsequent screenings in the records produced by SNF would imply that Mr. J.'s mental status had not changed since April.

6.      Mr. J. was the final witness. His testimony was by no means perfect. He testified in positive terms about his time at SNF, but also talked about suing SNF for keeping him at the facility against his will. He also testified about his interactions with the police, which he

---

[1] Hospital was the hospital facility where Mr. J. was cared for before his admission to SNF.

said were a result of him being concerned that somebody would steal his belongings when he was being moved between rooms at SNF. He also appears to be convinced that someone affiliated with the State is holding on to his debit card and refuses to return it. Mr. J. also does not understand the difference between a power of attorney and a guardianship, although he can hardly be faulted for that, as most people without legal training would be hard pressed to explain it. Mr. J. was also clear that his needs are simple—he can get all of the food and supplies he needs delivered, he has no desire to travel and has given up his driver's license, and when he does need to go somewhere he believes he can rely on his son or a friend to take him. He intends to continue taking his medications, which he insists he has no trouble taking. And he has full confidence in Petitioner as his power of attorney.

K. At the close of the Hearing, each of Petitioner, the First Attorney *Ad Litem*, and the Second *Ad Litem* (on behalf of Mr. J.) made their arguments regarding the Petition:

1. <u>Petitioner</u>. Petitioner's only concern is Mr. J.'s safety and well-being. He believes his father is no longer capable of managing his

home and affairs and requested appointment as guardian of Mr. J.'s person and property.

2.    First Attorney *Ad Litem*. The First Attorney *Ad Litem* supported Petitioner's appointment as guardian but argued that imposition of a more limited form of guardianship was appropriate because Mr. J. had made "significant physical improvement" but it was "highly probable" that Mr. J. could "become the victim of designing persons."

3.    Second Attorney *Ad Litem*. The Second Attorney *Ad Litem* opposed imposition of a guardianship over the person or property of Mr. J. Most significantly, the Second Attorney *Ad Litem* argued that the medical records from SNF contradicted the witness testimony that Mr. J. lacks the cognitive capacity to make his own decisions.

L.    "[T]he effect of the establishment of a guardianship is profound: in adjudicating any proposed ward as a [person with a disability], this Court is imposing the greatest diminution of an individual's autonomy and personal rights that any court may impose, short of a criminal conviction."[2]

M.    As the party seeking guardianship, Petitioner bore the burden of proving that Mr. J. is a person with a disability under Delaware law. A person

---

[2] *In re L.M.R.*, 2008 WL 398999, at *2 (Del. Ch. Jan. 24, 2008).

with a disability is someone who "[b]y reason of mental or physical incapacity is unable properly to manage or care for their own person or property, or both, and, in consequence thereof, is in danger of dissipating or losing such property or of becoming the victim of designing persons or, in the case where a guardian of the person is sought, such person is in danger of substantially endangering person's own health, or of becoming subject to abuse by other persons or of becoming the victim of designing persons."[3]

N.      "[T]he mental incapacity to which § 3901 refers includes (1) a pattern demonstrating an inability to recognize as relevant to decisions of significance, facts or considerations that one would expect reasonable and competent persons to recognize as relevant to such a decision; (2) a pattern demonstrating an inability to reason with respect to decisions that are relatively simple but personally important, in a way that is internally consistent; or (3) the presence of a mental disease or condition that interferes with the operation of the prospective ward's perceptions or reasoning to such an extent as to raise a substantial likelihood that decisions relating to matters of importance to her have been affected by that mental disease or condition."[4]

---

[3] 12 *Del. C.* § 3901(a)(2).

[4] *In re Gordy*, 658 A.2d 613, 617 (Del. Ch. 1994).

"Medical evidence is of significant importance" when determining whether these statutory grounds for incapacity are met.[5]

O.      "[I]mposition of a guardianship must be supported by evidence that is clear and convincing, and not merely by a preponderance of the evidence."[6]   Clear and convincing evidence is evidence that is "highly probable, reasonably certain, and free from serious doubt."[7]   In short, a guardianship "must only be imposed as a last resort, if less restrictive alternatives are not available[.]"[8]

**IT IS ORDERED**, this 22nd day of October, 2025, that:

1.      The Petition should be **DENIED**.   Petitioner should not be appointed as guardian of the person and property of Mr. J. at this time.

2.      The Petition and the physician's affidavit supporting it set forth a reasonably conceivable claim that Mr. J. had a disability under Delaware law and that he needed a guardian to protect his person and property.  When the Petition was filed, Mr. J. had only been at SNF for a short period of time.

---

[5] *Brittingham v. Robertson*, 280 A.2d 741, 743 (Del. Ch. 1971).

[6] *In re J.T.M.*, 2014 WL 7455749, at *3 (Del. Ch. Dec. 31, 2014).

[7] *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (cleaned up).

[8] *In re K.K.*, 2024 WL 6471034, at *2 (Del. Ch. July 3, 2005).

He had suffered significant injuries with the fall off the ladder and needed substantial assistance to perform most of the activities of daily living.[9]

3. But Petitioner failed to prove Mr. J.'s current incapacity by the necessary clear and convincing evidence needed. On the physical side, SNF records reveal—and its witnesses confirm—that Mr. J. has made nearly a full physical recovery. Dr. B. stated it clearly: "I don't have any concerns about his ADLs or activities of daily living like I did when he first got to the facility and needed more assistance."

4. And on the mental side, evidence of the level of impairment necessary to impose a guardianship was lacking. Skilled nurses notes produced by SNF establish that nurses consistently found Mr. J. to be "alert and oriented," "socially appropriate," and "able to make needs known," although the notes for some days say there were "periods of confusion."[10] But, importantly, there is no documentary evidence in the record that Mr. J. has

---

[9] The court notes that even in those early days there are medical records stating Mr. J. does not have a negative mental health diagnosis, including dementia or another neurocognitive disorder. SNF also appears to have considered Mr. J. competent enough when he was admitted to give informed consent and decline to take the most recent updated COVID-19 vaccine.

[10] The skilled nurses notes stating "periods of confusion" are from the first couple of months after Mr. J.'s admission to SNF (*i.e.*, April and May).

undergone a comprehensive cognitive diagnostic test to determine his decision-making capacity.[11]

5.     This is not to say there is no evidence of potential impairment. On the contrary, each of Petitioner, C.S., B.D., Dr. B., and the First *Attorney Ad Litem* describe interactions with Mr. J. that do suggest some level of diminished capacity, such as repeatedly calling law enforcement to make unfounded claims about SNF, and difficulty remembering interactions or conversations with people or recognizing that he has met people before.

6.     Three specific reasons for which Petitioner seeks appointment occupied a lot of the parties' attention during the Hearing, but none of them, alone or collectively, sustain a finding of incompetency.

---

[11] There are at least two skilled nurses notes stating that Mr. J. was "assessed by psychiatric professional due to referral sent by nursing staff," but no documents regarding these assessments were produced. Similarly, both C.S. and B.D. referred to "BIMS scores" for Mr. J., but no records documenting such scores were produced. "BIMS" stands for "Brief Interview for Mental Status" and it is a screening tool used in skilled nursing facilities and long-term care facilities to quickly assess a patient's cognition. Properly used, it can help identify cognitive changes and the need for a more comprehensive evaluation of a patient's mental capacity. But it may be of limited utility as a diagnostic tool. *See, e.g.*, Chih-Ying Li, et al., *Examining the Clinical Utility of the Brief Interview for Mental Status*, 15 RESEARCH IN GERONTOLOGICAL NURSING 124, 129 (May 2022) (concluding "clinicians and researchers may use the BIMS as a measure of basic cognitive function for patients in [skilled nursing facilities] and [long-term care facilities] . . . [but] the BIMS demonstrated a limited ability to identify difference in cognitive levels."). This is not to say that a full cognitive exam is always required. But here, at least, with inconsistent evidence in the record, a person with an alleged disability who is able to make his wishes known, and the intentionally heavy burden of clear and convincing evidence, a formal diagnostic exam would have been helpful.

a.    First, Petitioner and SNF staff testified that a guardianship is needed because Petitioner cannot get Mr. J. qualified for Medicaid without it. Petitioner testified to what appear to be considerable efforts at the Social Security Administration office in Dover to have Mr. J.'s Social Security benefits paid into a Miller trust, only to be told that the office would accept nothing short of a guardianship before allowing that. This would be troubling because it is the court's understanding that the Social Security Administration itself does not consider guardianship a prerequisite, as long as Petitioner can get appointed as a representative payee.[12] But the Social Security Administration's position cannot by itself justify imposing a guardianship absent clear and convincing evidence of incapacity.[13]

---

[12] *See* Soc. Sec. Admin., *Guide for Organizational Representative Payees*, https://www.ssa.gov/payee/NewGuide/toc.htm ("If we determine a legally competent adult is unable to manage or direct the management of their own benefits, we appoint a representative payee."). Holding a power of attorney is not, by itself, enough to be named a representative payee. *See* Soc. Sec. Admin., *Frequently Asked Questions (FAQs) for Representative Payees*, https://www.ssa.gov/payee/faqrep.htm ("The Treasury Department does not recognize power of attorney for negotiating federal payments, including Social Security or SSI checks. This means, if you have power of attorney for someone who is incapable of managing his or her own benefits, you must still apply to serve as his or her payee.").

[13] The First Attorney *Ad Litem* elicited helpful testimony from C.S. on this issue. It appears that Mr. J. may be conflating his Medicaid application with his stay at SNF, and believes that he can speed his return home by refusing to cooperate with

b.     Second, Petitioner and Dr. B. both expressed concern that Mr. J. living alone at his home would be unable to avoid scams and other financial predations.  But the only example to substantiate this concern was when Petitioner sought to elicit testimony from Mr. J. about some work done on his driveway; Mr. J. denied anything untoward or losing any money and Petitioner offered no evidence to contradict Mr. J.'s denial.

c.     Third, witnesses also expressed concern that Mr. J. living at home without constant supervision would fail to regularly take his medications.  Dr. B. does not consider Mr. J. able to manage his health independently, particularly with taking his medications when needed, and he said Mr. J.'s failure to take his medications could lead to serious health issues over time.  This would be concerning if it happens, but unless Mr. J. lacks competency, the decision whether and when to take his medications is his to make.  The record evidence did not establish that there was no solution short of a guardianship that could work here to help ensure Mr. J. takes his medications when he needs to, if

_____

Petitioner and SNF staff to establish his Medicaid eligibility, not understanding (or not caring) that the two are in fact not related.

(contrary to his own testimony) he will have trouble doing so if he is living at home.

7.    None of this is to suggest that the concerns expressed by Petitioner, Mr. J.'s caregivers at SNF, and the First Attorney *Ad Litem* are unfounded. On the contrary, there is evidence that Mr. J. returning home may not be the best decision. It may not even be a good decision. But those are not the standards by which we judge an individual's capacity to make decisions for themselves.

8.    The court does not reach this conclusion lightly.[14]    It is undisputed, even by Mr. J., that he needs some level of support, hence the power of attorney. But proving that Mr. J. has a mental incapacity under Delaware law was Petitioner's burden. And it is an intentionally heavy burden, requiring clear and convincing evidence. The evidence presented does not leave the court with an abiding conviction that it is highly probable, reasonably certain, and free from serious doubt that Mr. J. currently suffers from a mental incapacity that requires the protection—and serious imposition—of a guardianship. The same may not be true in a few months, but today the court must recommend that the Petition be denied.

---

[14] *See In re L.M.R.*, 2008 WL 398999, at *2 (Del. Ch. Jan. 24, 2008) ("I, along with the other judicial officers of this Court, take the imposition of any guardianship as a matter of great seriousness.").

9.  This is a final report under Court of Chancery Rule 144(c)(2)(B). Under Court of Chancery Rules 144(d)(4) and 6(a)(1)(C), anyone seeking to appeal this report must file a notice of exceptions by November 3, 2025.

/s/ *Christian Douglas Wright*
Magistrate in Chancery