COURT OF CHANCERY
OF THE
STATE OF DELAWARE

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

December 10, 2025

S.B.
[Address Redacted]

M.E.C.
[Address Redacted]

Kashif I. Chowdhry, Esq.
Parkowski, Guerke & Swayze, P.A.
909 Silver Lake Boulevard, 1st Floor
Dover, Delaware  19904

RE:  *In re Guardianship of W.E., a person with an alleged disability*,
C.M. No. 20895-K-CDW (LWW)

Dear Counsel, Ms. S.B. and Ms. M.E.C.:

Before me are exceptions to a final report of a Magistrate in Chancery.[1]  The Magistrate recommended that petitioner S.B. be appointed the sole guardian of her father W.E.'s person and property.[2]  He also recommended the denial of a cross-petition by M.E.C., W.E.'s longtime partner, who also seeks to be his guardian.[3] After a careful de novo review of the record,[4] I have made the difficult choice to adopt the Magistrate's recommendation and overrule the exceptions.

---

[1] *See* Exceptions to Magistrate's Final Report (Dkt. 16) ("Exceptions"); *see also* Ct. Ch. R. 144(c)(2)(B).

[2] Order and Final Report (Dkt. 15) ("Final Report") ¶ 1.

[3] *Id.*

[4] *See DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).  I have concluded that a de novo review can be performed without a hearing.  *See id.*; *accord Lynch v. City of Rehoboth Beach*, 2005 WL 2000774, at *1 n.3 (Del. Ch. Aug. 16, 2005) ("When the parties except to one or more of the Master's findings from the evidence in the case, the Court can read

Among the weightiest questions before this court are ones touching on the profound values of life, dignity, and family. This dispute places the court between two compelling forces: the deep affection of a long-term partner, and the protective oversight of a devoted daughter. When the court is asked to intervene in the life of a disabled person, it necessarily considers these relationships and the ward's wishes.[5] But the polestar of the court's inquiry is "the best interest of the [person with a disability]."[6] This standard requires that the court act as a conscientious steward for one who can no longer advocate for his own safety.

W.E., now seventy-one years old, suffers from severe dementia.[7] The record paints a picture of a man who has become untethered from the present. He is disoriented as to time and place, unable to answer simple inquiries, and tragically lacks the capacity to grasp the nature or consequences of a guardianship.[8] As his physician's affidavit notes, W.E. cannot make "meaningful communication."[9]

---

the record that is relevant to the exceptions raised and draw its own factual conclusions."). I have reviewed the trial transcript, all filings, the evidence, and watched a Zoom recording of the trial.

[5] *See* 12 *Del. C.* § 3901(a)(2).

[6] *In re Gordy*, 658 A.2d 613, 618 (Del. Ch. 1994).

[7] *See* Physician's Aff. (Dkt. 1).

[8] Attorney's Ad Litem Report (Dkt. 10) ("AAL Report") 3-4.

[9] Physician's Aff. 2.

For nearly three decades, W.E.'s life was shared with the cross-petitioner, M.E.C., who served as his caregiver until June.[10] When W.E. was of sounder mind and healthier body, he chose to place his trust and his day-to-day physical safety in her hands. M.E.C. also sincerely believes that W.E. wishes to return home with her.[11] Her devotion to his care is profound.

Yet I cannot overlook the concerns of the Attorney Ad Litem. He cautioned that M.E.C.'s view of W.E.'s health is inconsistent with W.E.'s actual medical needs.[12] M.E.C. believes that W.E. retains some independence and that she alone can care for him,[13] but the medical evidence reveals a man with extensive needs and no capacity to safely perform daily living activities.[14] He has suffered from escalating seizures, and his condition has worsened after a recent seizure episode brought about by an inadvertent medication mix-up.

In this tragedy, S.B. has shown the capacity to face the harsh truths of her father's illness. The Magistrate found, and the record supports, that S.B. is "best

---

[10] *See* Tr. of Evidentiary Hr'g (Dkt. 19) ("Trial Tr.") 19. In June, after W.E. was discharged from a rehabilitation facility, he moved into the home of S.B.'s mother. *Id.* at 12.

[11] *See* Exceptions ¶ 6.

[12] AAL Report 9; *see* Trial Tr. 65-66.

[13] *See* AAL Report 8; Cross-Petition (Dkt. 5) 4 (describing M.E.C.'s view that W.E. has "slight dementia").

[14] AAL Report 8-9; *see also* Physician's Aff.

position[ed]" to serve as fiduciary.[15] S.B. has made medical decisions for her father over the past decade, while he resided with M.E.C.[16] Now that W.E. is in his daughter's care, she has implemented thorough safety measures, including cameras, motion lights, and door alarms, to monitor W.E., who struggles with "sundowning."[17] She has also secured professional support, arranging for nurses and therapists to ensure his physical needs are met.[18] This court must put safety of the body over the history of the heart.[19]

My greatest hesitation in upholding this arrangement is M.E.C.'s statement that W.E. has developed bedsores while in S.B.'s care.[20] This is a serious rebuke of the current arrangement. Even the most organized guardian fails if the body of the ward is allowed to suffer. Viewing the record, I believe that S.B. is best suited to manage the medical regime to ensure that such harm will not recur. S.B.'s appointment as guardian does not require perfection, but her vigilance must be

---

[15] Final Report ¶ 3.f.

[16] Trial Tr. 14-15.

[17] *Id.* at 15.

[18] *See* AAL Report 5; Trial Tr. 21-22, 46; *see also id.* at 45-50.

[19] *In re Colon*, 1998 WL 1033059, at *4 (Del. Ch. Dec. 22, 1998).

[20] Trial Tr. 58; *see* Exceptions ¶ 4.

absolute, and her oversight must translate into physical safety. Should S.B. fail in that regard, M.E.C. may pursue relief.

M.E.C.'s exceptions also imply an openness to a co-guardianship (or at least cooperation) with S.B.[21] Ideally, W.E. would benefit from the combined strength of his partner's care and his daughter's oversight. Regrettably, though, the record reveals that such a partnership is unworkable. The parties openly blame one another for past medical lapses.[22] The Attorney Ad Litem believes that a co-guardianship would lead only to "further arguments and problems," to the detriment of the ward— concerns that are supported by the evidentiary record.[23] The court cannot manufacture cooperation that does not exist.[24]

That does not mean that M.E.C.'s place in W.E.'s life deserves little consideration. To sever a bond of nearly thirty years would be an unnecessary cruelty, and I am troubled by M.E.C.'s statements that S.B. and her mother have limited her access to W.E.[25] The Attorney Ad Litem and Magistrate recommended a built-in structure of continued private access for M.E.C. I agree.

---

[21] *See* Exceptions ¶¶ 11-12.

[22] AAL Report 5-6.

[23] *Id.* at 8; *see* Trial Tr. 17-18, 64, 66-67.

[24] *See In re Guardianship of A.R.*, 2025 WL 2017280, at *8-9 (Del. Ch. June 27, 2025) .

[25] *See* AAL Report 6-7.

Subject to a final order to be entered by the Magistrate,[26] S.B. should continue to ensure that M.E.C. is afforded reasonable, private visitation with W.E. This access should be regular and meaningful, so long as it does not interfere with his medical regimen or physical safety. S.B. is encouraged to facilitate—not impede—this connection so that W.E. can remain supported by the people who love him, even as his memory fades.

For these reasons, the Final Report is adopted as this court's decision. IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[26] Final Report ¶ 5.